### IN THE MATTER OF THE RECIPROCITY BANK.

The provision of the Constitution (art. 8, § 7) imposing individual responsibility upon stockholders, embraces banks specially chartered, and subject to the safety fund law.

The provision of the Constitution of 1821, requiring two-thirds of the members of the legislature to concur in an act for the alteration of a corporation, did not enter into the contract between the State and corporations chartered while it was in force, so as to prevent alteration of the charter, by a mere majority vote, under the present Constitution.

The power reserved in the charter to amend it, is one to be exercised by the legislative power, in any mode consistent with the Constitution for the time being.

A married woman holding stock in a bank is within the act (ch. 226 of 1849) to enforce the liability of stockholders, and is liable, as such, to assessment for its debts.

Whether the legislature could have exempted her consistently with the Constitution, *Quere.*

Where a safety fund bank has taken a surrender of shares of its stock in payment of debts, and has subsequently re-issued them, the purchaser cannot avoid liability as a stockholder, whether the bank had or had not the right thus to deal in its own stock.

The provision (§ 3) of the act of 1849, exonerating a stockholder upon his making a *bona fide* transfer to a resident of this State, is not, it seems, satisfied by a transfer to the bank itself. The purchaser must be one who succeeds to a personal liability distinct from and in addition to that of the bank.

No apportionment of debts and liabilities among the stockholders can be ordered until the receiver has converted the assets of the bank into cash—except so far as the same may be prevented by the pendency of litigation upon demands of the bank—and has declared a dividend thereof.

*It seems*, that the provisions in regard to time are directory only, so that the proceedings would not be void if the dividend should be declared, and the apportionment made after a delay which the terms of the statute do not allow. But where the only apparent reason for not converting the property of the bank into cash was that it could not be done without a large pecuniary sacrifice, *held* an insufficient reason for requiring a resort to the individual responsibility of the stockholders, until after such assets should have been exhausted.

APPEAL from the Supreme Court. The proceeding in this case was under the act of April 5, 1849, to enforce the liability of stockholders in banking corporations and associations, as prescribed in the Constitution of 1846. (Laws of 1849 ch. 226, p. 340.) The Reciprocity Bank was incorporated in 1834, by a special charter (Laws of 1834, p. 355), under the name of "The Sackett's Harbor Bank." In 1852 it was authorized to change, and it did change, its place of business to the city of Buffalo. (Laws of 1852, p. 188.) In 1857, its original name was changed to "The Reciprocity Bank." (Laws of 1857, vol. 1, p. 169.) On the 4th of September, 1857, upon the application of certain stockholders, made under section 10 of the said act of 1849, an order was made by Mr. Justice GREENE, of the Supreme Court in the eighth district, declaring that the bank was in imminent danger of insolvency, and appointing Mr. Williams receiver of its property and effects. In September, 1858, the receiver made a report to the said justice, according to sections 14 and 15 of the said act, stating, amongst other things, that, out of the cash in his hands, he had made a dividend of fifteen per cent on the circulating notes of the bank which had been presented to him; that there was due and owing from the bank, debts which amounted to about $179,000.

The report also showed a large amount of assets, which remained in the receiver's hands unconverted. Annexed to the report was a list of the stockholders of the bank, and their places of residence, so far as the receiver had been able to ascertain the same.

On the 27th of September, 1858, Mr. Justice GREENE made an order, according to the 16th section of the act, referring the report of the receiver, and the list of stockholders, to the Hon. Nathan K. Hall, with directions to apportion the debts and liabilities of the bank, contracted after the 1st day of January, 1850, remaining unsatisfied, amongst the stockholders, ratably, according to the principles of the said act, and to make report of his proceedings to a justice of the court. The referee appointed a day for the hearing of the matters so referred to him, and such proceedings were had before him that, in February, 1859, according to the 18th and 19th sections of the act, he made his report. By that report, he found that the bank made default in paying its debts on the 27th day of August, 1857, and never before; that all its debts and liabilities were contracted after the 1st day of January, 1850, and that they amounted, at the date of the report, to $179,864.13; and this amount he apportioned among the stockholders according to a schedule which was annexed to said report. On the hearing before the referee, S. Newton Dexter and other stockholders appeared and objected to being assessed for the debts of the bank, for various reasons. Some of the objections were common to all the stockholders, and some of them rested on peculiar grounds. Exceptions having been filed to the report of the referee, the same objections were urged in the Supreme Court against its confirmation. The report was, however, confirmed at a special term in the eighth district, in April, 1859. The stockholders appealed from that order, and the court, at general term, affirmed the decision. They then appealed to this court. The questions which arose before the referee, and which were considered determined by him and by the Supreme Court, together with the facts relating thereto, are stated in the following opinion.

*Francis Kernan, John Clark, John L. Curtenius, Hooper C. Van Vorst*, and *John Ganson*, for the different appellants.

*John L. Talcott* and *Henry W. Rogers*, for the respondent (the receiver).

COMSTOCK, Ch. J.   This court has recently determined in the matter of Oliver Lee & Company's Bank (21 N. Y., 9), that the free banking associations in this State, created before as well as after the Constitution of 1846 was adopted, are within the personal liability clause of that instrument and also within the act of April 6th, 1849, which was enacted to provide the means of enforcing such liability.   In the same case it was held that neither the constitutional provision nor the statute, construed as they were retrospectively, conflicted with the clause in the Constitution of the United States, which secures the inviolability of contracts.   These are among the questions brought up by the appeal in the case now before us, but they were disposed of adversely to the appellants in the decision referred to.

That decision embraced the class of institutions to which Oliver Lee & Company's Bank belonged, in other words the associations organized under the general law of 1838.   In this case the bank was specially chartered in 1834.   It belonged to the class of institutions for the redemption of whose notes the " Safety Fund " was established.   This class of banks, it is said, is not included in the constitutional provision or in the act of the legislature.   But we are clearly of opinion that no such distinction can be made.   The language of the Constitution (art. 8, § 7), is that " the stockholders in every corporation and joint stock association for banking purposes issuing bank notes," &c., " after the first day of January, one thousand eight hundred and fifty, shall be individually responsible," &c. This language is both too comprehensive and too precise to admit of any doubt.   All the specially chartered banks in the State were corporations for banking purposes.   It being more or less doubtful whether the so called free banks were also corpora-

In the Matter of the Reciprocity Bank.

tions, they were referred to under the further designation of "joint stock associations," thus leaving no doubt that both classes of institutions were intended to be embraced. The legislature, in the act of 1849, spoke in terms equally explicit.

Another provision in the Constitution was referred to on the argument as exempting the safety fund banks from the personal liability clause. Article 1, section 18, declares that nothing contained in the Constitution shall affect grants or charters made by the State or under its authority since 1775. It is true that when the Constitution of 1846 was framed and adopted, the Reciprocity Bank held a charter from the State which was embraced in the provision here referred to. But it was a part of that charter that the legislature might "at any time alter, modify or repeal the same." (Laws of 1834, 361, § 37.) Within the power here reserved the legislature would have had the right to pass the statute of 1849, and to impose the very liability now in question, even if the Constitution of 1846 had never been adopted. This proposition was necessarily involved and was determined in the case of Oliver Lee & Company's Bank. In holding that a personal liability could be lawfully imposed upon the shareholders in that bank, the decision was placed upon the reserved right to alter or repeal the general act under which it was organized. In the present case, as well as in that, the exercise by the legislature of the power in question is certainly none the less effectual because it has the superadded sanction of a constitutional provision. Nor can a constitutional provision declaratory of a change in the principles of a corporate organization be said to affect or impair a charter which in its own terms admits of the very change declared. If the legislature in pursuance of a right reserved may alter or repeal the charter of a corporation without violating the obligation of a contract, the same thing, I apprehend, may be done by the People when they establish the fundamental law of the State. But without pursuing this inquiry further, the objection we are considering is sufficiently answered when we refer to the act of 1849, as the authority for charging stockholders with the debts of banking corporations.

The Constitution of 1821, in force when this bank was chartered, required the assent of two-thirds of the members in each branch of the legislature to pass an act " creating, altering, continuing or renewing any body politic or corporate." The charter of this bank, as we have seen, reserved to the legislature the right at " any time to alter, modify or repeal the act." The Constitution of 1846 does not require a two-thirds vote in enacting laws of this character, and the statute of 1849, imposing the liability in question upon stockholders, was not passed by such a vote. It is now urged that the provision referred to in the Constitution of 1821 entered into the compact between the State and the corporators in this institution, and therefore, that no act of the legislature can be passed affecting their rights as such, without the assent of two-thirds of the members elected to each branch. To this doctrine we cannot assent. Regarding the reserved power to alter, modify or repeal, as a part of the compact, its literal and obvious interpretation is, that the franchises and privileges granted were at all times subject to abrogation or change by the legislative power of the State. The fundamental law might be changed either in respect to the constitution of the legislative body, the mode of its action, or the majorities by which it could act in reference to this or any other subject. The power reserved in this charter was one to be exercised at any time by the existing legislative authority, however constituted, and in any mode conforming to the organic law of the State for the time being. The charter of the bank did not say that the legislature, by a vote of two-thirds, might alter, &c., but that the " legislature " might at any time alter, modify or repeal the act. We are clearly of opinion that the statute of 1849 was a valid exercise of the right thus reserved, because it was an act of the supreme legislative authority not in conflict with any existing constitutional restraints.

Proceeding now to such questions as affect the separate or particular interests of some of the appellants and not others, it appears that Mrs. Lansing, in 1840, while a *feme sole*, became

the owner of some shares of the stock. She was married to Mr. Lansing in 1841, but the stock has stood in her name to the present time, and she has received the dividends thereon. It is insisted that she is not liable to be assessed in respect to this stock to pay the creditors of the bank. The question may not be entirely free from doubt, but our conclusion is, that the assessment upon her was lawfully made. The rule of the common law was, that choses in action, including shares of stock, by reason of their resemblance to that description of property, owned by a woman at the time of her marriage, continued to be her property after marriage until reduced to possession by her husband. The statute of 1848, for the protection of the rights of married women, it seems, did not and could not, constitutionally, take from the husband this right of reducing to possession, where the right became vested by marriage prior to the passage of the act. (*Westervelt* v. *Gregg*, 2 Kern., 202.) But Mr. Lansing never exercised the right in respect to the shares in question. They remained, therefore, her property, after marriage as before. She continued to be a stockholder, and as such was liable to assessment, by the terms of the statute under which these proceedings were had. (Vide § 1.) The legislature, if it had thought proper to do so, might have made an exception in favor of married women, but no such exception was made. It is said that Mrs. Lansing, being under the disabilities of coverture, could not make a transfer of her shares and so avoid this liability, if she had wished to do so. This is a circumstance which might have been properly addressed to the legislative discretion, if, indeed, the legislature had any discretion under the injunction of the Constitution; but it does not authorize the courts to allow an exemption where neither the Constitution nor the law has declared any. It is also said, that *femes covert* are not liable to suit or judgment at the common law, and, in general, this is true. It is also true, that the apportionment of liability amongst stockholders in banks, when duly confirmed, becomes a judgment against each stockholder, to be enforced by execution, as in other cases. But it was competent for the legislature to

depart from the rules and analogies of the common law, and to make married women and their estates liable in this proceeding, as other shareholders in banks are made liable. This, we think, has been done, and it seems to us proper to add, that we see no reason why it ought not to be done, in order to effectuate the policy in which the constitutional provision and the statute are founded. It might go far to defeat that policy, if married women could take and hold stock without liability to the creditors.

Mrs. Dann was also a married woman, and she was assessed in respect to 263 shares of the stock which stood in her name, until the day before the bank suspended payment. It appears very clearly, that she had separate property, derived from the estate of her father, which was vested in trustees. That property was surrendered to her by the trustees after the statutes of 1848 and 1849, concerning the rights of married women, were passed, and from that time it was managed by her husband. Some portion of the fund was invested by him in those shares of stock. It also appears, that the day before the failure of the bank, she transferred the shares to her husband. This transfer seems to have been without any consideration, and the referee found that it was made with intent to evade the liability of Mrs. Dann as a stockholder to the creditors of the institution. We think, therefore, that she was properly included in the assessment.

Mr. Alexander, and some other parties, were assessed in respect to certain shares of the stock which they purchased from the bank in January, 1856. It appears that some time previous to that date the bank had taken a surrender of a considerable amount of its own stock in payment of debts which the holders owed to the institution, and which it seems they were otherwise unable to pay. It was supposed that dividends could not be made until this stock was disposed of and re-issued. For that reason it was offered for sale, and portions of it were sold to Alexander and other persons, who have appealed from the proceedings by which they were assessed. They bought at 90 per cent on the par value of the stock, and gave their notes for the price, it being the understanding that the scrip

In the Matter of The Reciprocity Bank.

should be left in the bank as collateral to the notes, and that they might afterwards re-transfer the stock and take up the notes. They were credited with the shares on the stock books, and except as to Mr. Alexander, the shares stood in their names until the failure of the bank. Mr. Alexander made a re-transfer on the 6th of March, 1857. The failure of the bank was on the 27th of August following.

The objection to the apportionment of liability urged by this class of appellants as peculiar to themselves, is, that the bank could not, in the manner stated, legally become the purchaser or owner of its own stock, and therefore, that these persons could not and did not acquire a derivative title from the bank. In support of this objection the statutes have been referred to, which impose restraints upon the specially chartered banks in this State, in respect to dealing in their own stock. (1 R. S., 589.) We think it unnecessary to inquire whether the purchase by this bank of shares of stock under the circumstances above mentioned, falls within those restraints. Assuming that the bank owned the stock, the directors caused it, or a portion of it, to be sold to Alexander and others. They became actually the purchasers, and they voluntarily suffered their names to appear as stockholders on the books. They cannot, in this proceeding, impeach their own title. The statute of 1849, imposing the personal liability, declares that the term "stockholder" shall apply not only to such persons as appear by the books of the corporation or association to be such, but also to every equitable owner. (§ 2.) No doubt a person may show in exoneration of himself, that his name has been placed in the books without his consent. But if a party makes an actual purchase of shares, whether from the bank or an individual holder, and voluntarily allows himself in this manner to be represented to the world as a stockholder, he must take the responsibilities of that situation. He comes within the terms and the policy of the act. His title may be imperfect. Equities may exist between him and other parties; the shares may be in dispute; they may be claimed by some one else in hostility to his own right. The statute has no regard to such questions.

The person who has caused or allowed his title to be registered on the books cannot deny the truth of that representation and disavow the ownership when it ceases to be a benefit and comes to be a burden.

In respect to Mr. Alexander, the peculiarity attending his case is, that his stock purchased from the bank was re-transferred a few months before the institution suffered a default in the payment of its debts. He was, therefore, assessed by the referee only for his own proportion of the debts and liabilities remaining unsatisfied, which were contracted before the re-transfer was made. This was correct according to the 3d section of the act. That section provides that the holder of stock, when a debt is contracted, may exonerate himself from responsibility therefor, if, before default in the payment of such debt, he makes a *bona fide* transfer of his stock on the books to any resident of this State of full age; and the section then further declares that every assignee of stock so transferred before default shall be liable in the same manner as if he had been the owner at the time the debt was contracted. We think it quite evident that a transfer or surrender to the institution itself which issued the stock does not exonerate the person making the transfer. The purchaser from him must be one who succeeds to a personal liability distinct from and in addition to the liability of the bank. The bank cannot be such a purchaser.

So far, therefore, we see no error in the decision of the court below. A question remains which presents greater difficulty. It appears from the proceedings returned on this appeal, that when the order of reference was made to apportion the debts amongst the stockholders, the receiver had in his hands assets of the bank which nominally amounted to much more than all the liabilities. These assets consisted of choses in action and judgments recovered, and there were also various parcels of real estate. In the receiver's report to the justice of the Supreme Court on which the order of reference was founded, the only reason stated for not having converted the real estate was that prices were depresssed. In regard to the very large

amount of debts due to the bank, he reported that a considerable portion were deemed good and collectable. No reason was stated for not having converted the assets of that nature, except that the receiver believed that the interests of the creditors would be promoted by further efforts, to collect the debts rather than by offering them for sale. It was not in any manner shown to the justice that the assets on hand convertible without litigation, were not sufficient to pay all the debts of the corporation, although such was very probably the fact.

The question then seems to be whether a receiver appointed under the statute of 1849, can immediately or as soon as he pleases, make a small or nominal dividend in favor of creditors without attempting to convert the general assets of the bank in his hands, so that upon his report of such a dividend being made a further proceeding must be taken to compel the stockholders to satisfy all the debts and liabilities of the corporation. The statute is imperative that he shall, within thirty days after declaring the dividend, make his report including a list of the stockholders, and upon that report being made, that a reference shall be ordered to apportion the debts and liabilities amongst the holders of the stock. If the course of proceeding in this case was lawful, there is no power to control the discretion or caprice of the receiver. He can take the initiatory step towards compelling the stockholders to pay the creditors by declaring a dividend at any time and of any sum however small, and that step being taken the others are distinctly pointed out, and there is no discretion in regard to them. (Vide §§ 12–16.) Upon an attentive examination of the act, which is certainly somewhat obscure in this respect, I have come to the conclusion that the receiver is clothed with no such discretion, and I think, moreover, that no good reason can be assigned for giving him a power so extensive and so capable of being very improperly exercised.

The 1st section of the act declares, in general terms, that when banks are in default for not paying debts or liabilities contracted after January 1, 1850, the stockholders shall be individually responsible, equally and ratably; such responsi-

bility to be enforced as thereinafter provided, and in no other manner.   Passing over the intermediate sections which are not material to the present inquiry, the 12th section provides that, under the direction of the Comptroller, all securities deposited with him belonging to the corporation or association shall be converted into cash by the receiver with the least possible delay; that the receiver shall also convert into cash the effects and demands (meaning evidently the other effects and demands) of such corporation or association, and for that purpose may sell at auction any demands which a justice of the Supreme Court shall authorize to be sold; and that within ninety days from his appointment, which may be enlarged to ninety days longer by a justice of the Supreme Court, he shall declare a dividend of the cash in his hand amongst the creditors.   The 13th section declares that before making the dividend, he shall deduct expenses and also the sums paid to exonerate the property which was in his hands from any pledge, specific lien or levy.   The 14th and 15th sections require him, if any debts remain unsatisfied within thirty days after declaring such dividend which is called the first dividend, to render an account of his proceedings, including a report of the names of the stockholders.   Upon this report being made, the 16th section requires the justice to direct a reference for the apportionment of the unsatisfied debts amongst the stockholders.   The 17th, 18th, 19th and 20th sections, relate to the proceedings of the referee, and the confirmation of his report, which when confirmed becomes a judgment against the various stockholders for the sums charged upon them respectively.   The 21st section requires the money collected from them to be divided amongst the creditors in the same manner as provided in relation to the first dividend.   Thus the statute evidently contemplates one dividend, called the first, to be made by the receiver out of the assets which went into his hands, and then a second one, in full, to be made from the moneys to be collected from the stockholders.   The 23d section declares that neither the dividends nor the apportionment of debts shall be delayed by the pendency of any litigation respecting any demand by or against

In the Matter of The Reciprocity Bank.

the bank, unless directed by a justice of the Supreme Court, nor in any case to exceed one year. If the controverted demand is against the bank, the receiver is to retain in his hands a fund to provide for it, or to be distributed in some future dividend to creditors or stockholders. The 24th section provides that if after paying the debts there shall remain or come to the hands of the receiver any other assets, the same shall be converted and paid to the stockholders amongst whom the liabilities have been apportioned. The 31st section allows creditors who have failed to present their demands before the first or any subsequent dividend, to come in before any second or subsequent dividend is made, and receive their due share before distribution is made to other creditors.

Notwithstanding the want of greater clearness of expression, it seems to me the intention of the legislature was to devise a plan, first for the administration of the assets of a defaulting bank, and then, if creditors are unpaid, for compelling stockholders to make up the deficiency. It is very clear that a dividend is first to be made from the effects of the institution. According to one construction this dividend may be of a single mill on the dollar, and may be declared for the mere purpose of reaching the stockholders. According to the only other construction—which I think the better one—the convertible assets in the hands of the receiver are to be actually converted, and go into the first dividend before resorting to the personal liability. If this was not the intention, it is not easy to see a good reason for requiring that any dividend at all should be first made. In providing that a dividend must be made, it is reasonable to conclude that the legislature did not mean a merely nominal one, as a condition precedent to the enforcement of the stockholder's liability, but one based on the convertible and cash value of the assets of the bank.

The leading and controlling section of the statute is the 12th. In that, the duties of the receiver are prescribed in a certain order. He is to convert the securities lodged with the Comptroller into cash as soon as possible. He is then commanded to make a like conversion of all other effects in his

hands, and to that end he may sell at auction, under the direction of a judge. These duties being first enjoined, he is then required to declare a dividend within a specified time after his appointment. That time is given to him, as I think, to effect the conversion of the assets, and if it is too short, he may apply to the judge and have it enlarged ninety days longer. Then, if any unsatisfied debts remain, the receiver is to make a report, (§14) which becomes the foundation of the further proceedings to charge the stockholders, and this report is to be made within thirty days from the time of declaring the dividend and of the converted assets. The legislature evidently thought that six months was a sufficient time within which to realize the cash from the convertible estate in the receiver's hands, and they accordingly required him to make his dividend within that time. Within that period it was certainly practicable to make a sale for cash of all estate not involved in litigation or controversy, and the legislature proposed no delay for hard times or depression in prices. The design was to wind up any insolvent bank within a definite time, and then to resort to the stockholders to make good the deficiency, so that creditors might be speedily paid. Nevertheless, I think the provisions in regard to time are merely directory, in such a sense that the proceedings would not be void or erroneous if the dividend should be declared and the report made after a delay which the terms of the statute do not allow. But I do not think it would be a sound construction to hold that the receiver may, without any attempt to convert the estate, proceed whenever and as soon as he pleases to declare a sham dividend, so that the stockholders may be proceeded against, leaving him to deal with the primary fund at his leisure or convenience. I am satisfied the legislature had no such intention.

The 23d section of the act is not in conflict with these views. That section is a provision for a special case. A litigation or controversy might be pending which would either increase or diminish the assets according to the result and the nature of the disputed claim. In a case of that kind, if the demand be in favor of the corporation, the statute seems to regard it as

inconvertible until the litigation is closed; but none of the proceedings are to be delayed for that reason without the direction of a justice of the Supreme Court, and in no event can the delay exceed one year. If the demand is realized afterwards, the proceeds must go to creditors, if they are not in the meantime fully paid, and if they are, then to the stockholders. It seems to me that such a provision for a particular case strengthens, rather than weakens, the conclusion that the known and admitted assets, about which there is no controversy, must be converted and applied before the receiver can initiate the proceedings to charge the stockholders. The 24th section provides for the case when assets remain or come to the receiver's hands after the debts are all paid. These are to be converted into cash and paid to the stockholders who have been personally charged. This provision is also in harmony with the general scheme. After the receiver has converted and applied the assets at large, some demand, supposed to be worthless, may be collected, or some real estate discovered or controverted claim be established. In this way, something may remain in his hands or come to his hands after all the proceedings have been closed and the creditors are paid. In such a case, the stockholders are plainly entitled to whatever there is, in proportion to the sums they have been compelled to pay. The propriety of just such a provision as is here made will not be doubted, even if my construction of the act be admitted. Nor do I see anything in the 31st section which materially supports a different construction. A creditor who has neglected to present his claim before the first or any subsequent dividend, but presents it before a second or subsequent dividend, is entitled to be placed on an equal footing with other creditors before they can receive any further distribution. The possibility of more than one and even of more than two dividends is here indicated. But this does not conflict with the idea that the first one, which is the foundation of all future proceedings, is to be based upon a general conversion into cash of the property of the bank. Another, as appears from the 23d section, may be made from the proceeds of demands which are involved in

dispute or litigation, and another from the moneys to be collected from the stockholders. The general language of the 24th section may therefore be referred to those dividends, and thus understood it does not conflict with what I consider to be the general scope and policy of the statute.

It follows, from these views, that the order of reference to apportion the debts and liabilities of the bank amongst the stockholders, and all subsequent proceedings based thereon, were erroneous. The judgment of the Supreme Court must, therefore, be reversed, and that court will proceed to give judgment in accordance with this conclusion.

All the judges concurred except DENIO, J., who took no part in the decision, and WELLES, J.

WELLES, J. (Dissenting.) The only question which I shall examine in this case is, whether a justice of the Supreme Court has power to direct an apportionment of the debts and liabilities of an insolvent bank among the stockholders, before the assets of the bank are exhausted. The other questions in the case are, in my judgment, properly disposed of in the foregoing opinion of Judge COMSTOCK.

Section 12, of chapter 226 (Laws of 1849, p. 344), is as follows:

"Under the direction of the Comptroller, all securities deposited with him belonging to such corporation or association, shall be converted into cash by the receiver with the least possible delay, and the receiver shall also convert into cash the effects and demands of such corporation or association, and for that purpose may sell at auction any of the said demands, which any justice of the Supreme Court shall authorize to be sold; and within ninety days from the time of his appointment, unless such time be enlarged by a justice of the Supreme Court, which may be done for a period not exceeding ninety days, such receiver shall declare a dividend of the cash in his hands among the creditors of such corporation or association."

This section requires that within one hundred and eighty days from the appointment of the receiver, he shall make one

In the Matter of The Reciprocity Bank.

dividend. The direction is positive and unequivocal. There is no provision for an extension of time beyond that period. The dividend is to be made of the money which the receiver shall realize from the securities in the hands of the Comptroller (if there be such, as must always be the case with respect to banks organized under the general law), and also from the other effects and demands of the failing bank.

With respect to securities in the hands of the Comptroller, the receiver is to convert them " with the least possible delay." He is also required to convert the " effects and demands " of the bank into cash. He is not required to do this " with the least possible delay," as in the case of securities deposited with the Comptroller, but he is simply required to convert the effects and demands of the corporation or association into cash. By these is clearly intended the effects and demands not deposited with the Comptroller.

The reason for the discrimination made by the legislature between securities in the Comptroller's hands and the other assets of the bank, arises out of the two classes of assets. The securities deposited with the Comptroller, if made and taken in accordance with the requirements of the law, being either State stocks or stocks of the United States, or mortgages upon improved productive unincumbered lands within this State, worth, independently of any buildings thereon, at least double the amount for which they are mortgaged, may be at once converted.

The ordinary " effects and demands" of a bank may have an indefinite and uncertain value; and much time may be required for investigating and ascertaining their true value; and hence the forcing them to a speedy sale is properly left to judicial discretion.

If we are confined in our examination of this question to section 12 of the act referred to, I think it clear, that while the legislature absolutely directed receivers to convert deposited securities without delay, it contemplated the contingency of a dividend before the final conversion of the other assets of the corporation. The " effects and demands " can only be con-

verted in three modes, viz.: By the voluntary action of the debtors, or by process of law, in respect to "demands," or as to both demands and effects by a sale thereof. A sale, other than at auction, may be entirely out of the question, and the certainty of voluntary payments by the debtor may be equally improbable. One hundred and eighty days, however industriously employed, are entirely inadequate to secure the result by legal coercion. The only mode left, then, by which a conversion of the "effects and demands" within the time limited may be effected, is through a sale by auction; and this the receiver cannot resort to, unless authorized by a justice of the Supreme Court. This authority may be given or withheld, in the discretion of the justice. No one will contend that the time for declaring the dividend is made to depend upon the manner this discretion may be exercised by the justice.

From a careful analysis of section 12, it is apparent that the receiver may be required to declare a dividend before it is possible for him in any of the modes contemplated, or within the range of his powers and authority, to convert the "effects and demands" of the bank into cash.

If the view thus taken of the proper reading and meaning of section 12 be the true one, any further consideration of the question would seem to be unnecessary; for we find by section 14 of the act, that the receiver is required within thirty days after the declaration of the first dividend, among other things, to render to a justice of the Supreme Court a particular account of the debts and liabilities remaining unsatisfied; and that by section 16, the justice is directed "thereupon" to refer the same to a referee, who is required to apportion said debts and liabilities among the stockholders, and report his proceedings to the justice. The time within which the receiver is required to make the first dividend is absolutely restricted to one hundred and eighty days. No court or officer has power to extend it beyond that time. He is required to declare this dividend within ninety days from the time of his appointment, unless such time be enlarged by a justice of the Supreme Court, which the act allows to be done for a period

not exceeding ninety days. If the justice refuses to extend the time, the receiver is bound to make a dividend within the first ninety days. That was the time fixed by the legislature as the general rule on the subject; but as it was foreseen that cases might arise which would require a longer time for the receiver to get ready to make the first dividend, authority was given to the justice to extend it, but not exceeding ninety days. Within the hundred and eighty days, then, the dividend is to be declared. The receiver does declare it in that time, and finds that it falls short of satisfying the debts, and liabilities of the corporation, for which the stockholders are liable. What is next to be done? The 14th section answers the question. He shall within thirty days after the declaration of the first dividend, and without waiting for the actual payment of the sums divided, render the account as required by that section, to a justice of the Supreme Court. The 15th section requires him at the same time of rendering such account, to report and submit to the justice. a list and statement of stockholders as provided in that section. Upon such account being rendered and such report being submitted to the justice, he is required, by the 16th section, to refer the said report and list of stockholders to a referee to be appointed by him, with directions, after giving notice to all persons concerned, to apportion the debts and liabilities of the corporation contracted after January 1st, 1850, and remaining unsatisfied, among the stockholders, and report his proceedings to the justice or some other justice of the Supreme Court of the same district. Sections 17 and 18 direct how the referee shall proceed in executing the order of reference. By section 19, on the final completion of the apportionment, the same shall be reported at a special term of the Supreme Court, when the justice holding such term shall examine such report, and hear the allegations of the parties and persons interested and may modify or amend the same, or may refer the same back to the same or another referee for further proof or examination, or may confirm the same. By section 20, when the report of the referee is confirmed at a special term, the same, together with the order of reference,

shall be filed in such county clerk's office as shall be directed by the justice holding the special term, and unless an appeal be taken therefrom, the order of confirmation shall be final as a judgment against each stockholder, &c., upon which executions may be issued, &c.

All the directions of the statute have, in the case before us, been, in form at least, complied with. When the receiver rendered his account and submitted his report in pursuance of the 14th and 15th sections, the justice had no alternative but to order the reference to apportion the debts upon the stockholders. The 16th section is imperative upon him. He "*shall thereupon* refer the said report and list of stockholders to a referee," &c.

The report of the receiver, upon which the order of reference to apportion the debts and liabilities of the Reciprocity Bank upon the stockholders was made, bears date September 21st, 1858. It contained, pursuant to the directions of the 14th section, a particular account of such debts and liabilities, which remained unsatisfied, with a preliminary account of all his proceedings, setting forth the amount of the cash realized by him, the expenses and allowances claimed by him, the payments the receiver had made, the amount on hand to be divided, and the dividend declared by him. The report shows that at the time the dividend was declared, which was on the 1st day of September, 1858, the receiver had realized in cash from the assets of the bank, the sum of $145,294.52, and that the total cash disbursements of the receiver up to that time, was $136,202.58, leaving a balance in his hands of $9,091.94. It was of this last amount that the dividend was made. A large portion of the moneys received after his appointment and before the dividend was declared, was paid by the receiver in order to exonerate the property of the corporation from pledges and specific liens, in pursuance of section 13 of the act. The dividend amounted to fifteen per cent of the amount of circulating notes of the bank which had been presented to the receiver for redemption, up to the time the dividend was declared, and was made in favor of the persons presenting such notes. The

report further shows a large amount of debts and demands, owing to the bank by a large number of persons in various amounts respectively, a considerable portion of which was not due when the report was made. The report also shows quite a large amount of real estate, which belonged to the corporation at the time the receiver was appointed, a part of which has been sold and the proceeds realized in money by him, which he has charged himself with in his account of moneys received. The receiver states in the report as follows: " A considerable portion of the debts due the said corporation, are considered good and collectible. The undersigned believes that the interests of the creditors of the said corporation will be promoted by further efforts to collect the debts due the corporation rather than by offering them for sale, and in consequence of the depression in the price of real estate, he has not felt that he would be doing justice to the creditors of the said corporation by exposing the real estate in said schedule for sale at public auction." These facts are referred to for the purpose of showing that the dividend was not merely nominal, but substantial and the best that the receiver could make. He undoubtedly refrained from making an application to a justice of the Supreme Court for an order to sell the demands against the debtors of the bank, for the same reason that induced him to omit selling the real estate at auction. If any creditor or stockholder desired such application to be made, it was entirely competent for them to cause it to be done. If such application had been made at any time before the dividend was declared, the justice, I think, would have hesitated long before granting it, in view of the great commercial crisis of 1857 and 1858, the effects of which were co-extensive with the commercial world. And if the conduct of the receiver was in any respect objectionable, if he neglected to sell the real estate or to press collections of demands due to the bank, he was an officer appointed by the court, under its control and liable to be acted upon and moved or removed from his position on the petition of any person or persons interested. But none of these considerations are to delay the dividend beyond the period provided in the

statute.   When the first dividend is declared, the time has come to proceed against the stockholders.

These considerations are, to my mind, conclusive to show that the legislature did not intend, in any or all of the provisions of the statute referred to, that the creditors of the failing bank should be required to wait until the assets should all be fully converted and realized in money by the receiver, before they were at liberty to call on the stockholders.   The Constitution (§ 7, art. 8) declares the absolute, unconditional personal liability of the stockholders for the debts and liabilities of the bank contracted after the 1st day of January, 1850, and the act of the legislature under which these proceedings were had, was passed to enforce and carry into effect the principle thus declared by the fundamental law.   There is not to be found in the statute a single word looking to a full conversion of the assets, or of any portion or class of them, as a condition precedent to an apportionment of the debts upon or amongst the stockholders.   All that is required is, that a single dividend should be declared before resort could be had to the stockholders.

By requiring one dividend to be made before the stockholders should be called upon, both they and the creditors would derive a benefit.   The creditors would have the benefit of such ready cash funds as should come into the hands of the receiver upon his appointment, together with such as he might realize from sales of property and collections of debts due the bank before he was required by law to declare the dividend. And by the same process the amount to be assessed upon the stockholders would be reduced.   But to say that in all cases the assets of a bank, whether of large or small capital and business, or that the Reciprocity Bank, with its capital and business as we find by the papers in this case they were, could be converted within the utmost limit allowed for making the first dividend, without ruinous sacrifices to all concerned, by forced sales of the debts due the bank, under an order of a justice to that effect, if one could be obtained, is to my mind nothing less than preposterous.   The act has left the way open for an

indefinite number of dividends, as circumstances may require. The 31st section provides for creditors who have neglected to present their demands to the receiver before the first or subsequent dividend, and who shall present the same before the second or any other subsequent dividend.

The question is, simply, which of the two classes of persons, the creditors or stockholders, shall be compelled to wait the process of conversion of the effects and demands of the corporation.

That is all it amounts to. If the stockholders are compelled to pay the creditors, they will be entitled to be reimbursed from the effects and demands in the hands of the receiver, so far as they will go, when converted or realized in cash. They will have no more to pay in one event than the other, and to them it is only a question of time. The Constitution makes them the debtors by declaring their personal liability to pay, and in my judgment it results from the whole spirit and tenor of the Constitution, and the several provisions of the enforcing statute which I have considered, that the stockholders must pay the creditors what remains due them after the first dividend is declared, to the amount of their stock; and look to the assets of the corporation for their indemnity, as far as they will go.

In my opinion, the judgment of the general term of the Supreme Court, affirming that of the special term, should be affirmed.

Order of reference to apportion liability of stockholders, and all subsequent proceedings, reversed.