\* NOBLE STATE BANK v. HASKELL *et al.*

No. 83.     Opinion Filed September 11, 1909.

(97 Pac. 590.)

1.   **BANKS AND BANKING—Depositors' Guaranty Fund. Constitutionality—Due Process of Law.** The act "creating a state banking board, establishing a depositors' guaranty fund to insure depositors against loss when the bank becomes insolvent," etc., of December 17, 1907 (Laws 1907-08, p. 145, c. 6 art. 2), as amended on February 12, 1908 (Laws 1907-08 p. 153, c. 6, art. 3), is not in conflict with section 7, art. 2 (Bunn's Ed. Sec. 16) of the Constitution which provides that 'No person shall be deprived of life, liberty, or property, without due process of law."

2.   **SAME—Obligation of Contracts.** Nor is it in violation of section 15, art. 2 (Bunn's Ed. Sec. 24) of the Constitution, which provides that "no law impairing the obligation of contracts shall ever be passed."

3.   **SAME—Pursuit of Happiness.** Nor is it in violation of section 2, art. 2 (Bunn's Ed. Sec. 11) of the Constitution, which provides that "all persons have the inherent right to life, liberty, the pur-

*Appealed to the Supreme Court of the United States.

suit of happiness, and the enjoyment of the gains of their own industry."

4.   SAME—Taking Private Property for Private Use. Nor is it in violation of section 23, art. 2 (Bunn's Ed. Sec. 32) of the Constitution, which provides that: "No private property shall be taken or damaged for private use, with or without compensation, unless by the consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining or sanitary purposes, in such manner as may be prescribed by law."

5.   SAME—Taking Private Property for Public Use. Nor is it in violation of section 24, art. 2 (Bunn's Ed. Sec. 33) of the Constitution, which provides that "private property shall not be taken or damaged for public use without just compensation."

6.   SAME—Statutes—Title of Act. Nor is said act, embracing the provision relative to the establishment of the depositors' guaranty fund, to secure depositors against loss when the bank becomes insolvent, invalid on account of section 57, art. 5 (Bunn's Ed. Sec. 130) of the Constitution, which provides that: "Every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except * * * ; provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof."

7.   APPEAL AND ERROR—Review—Waiver of Error. When the brief of the plaintiff in error, in any civil cause, fails to preserve, by specification of error, any point complained of in the lower court, such question is thereby waived in this court.

8.   SAME—Review—Denial of Injunction. Where the probative allegations do not aver that the injury apprehended is irreparable, and the chancellor denies an application for a temporary injunction, on review in this court the action of the lower court will not be reversed.
      (Syllabus by the Court.)

*Error from District Court, Logan County; A. H. Huston, Judge.*

Action by the Noble State Bank against C. N. Haskell and others. Judgment for defendants and plaintiff brings error. Affirmed.

This is a proceeding by plaintiff in error, as plaintiff, seeking to reverse the judgment of the district court sustaining the demurrers of the defendants in error, as defendants, in the lower court to plaintiff's petition. The constitutionality of an act of

the Legislature of this state creating a depositor's guaranty fund is involved. The petition, omitting the caption and exhibits, is as follows:

"Comes the plaintiff in said cause, and for its cause of action against the defendants states the following facts:

"(1) The said plaintiff is a corporation organized under the laws of the territory of Oklahoma.

"(2) The defendant C. N. Haskell is the Governor of the state of Oklahoma, the defendant G. W. Bellamy is the Lieutenant Governor, the defendant J. P. Connors is the President of the State Board of Agriculture, the defendant J. A. Menefee is the State Treasurer, the defendant M. E. Trapp is the State Auditor, and the defendant H. H. Smock is the Bank Commissioner, of the state of Oklahoma.

"(3) The said plaintiff is a banking corporation organized under the laws of the territory of Oklahoma, with an authorized and paid-up capital stock of $10,000, and its articles of incorporation were filed in the office of the Secretary of the territory of Oklahoma on the 23d day of May, 1902, a copy of said articles of incorporation being hereto attached, marked 'Exhibit A' and referred to as a part of this petition. On said 23d day of May, 1902, the territory of Oklahoma issued to said plaintiff a patent, a copy of which is hereto attached, marked 'Exhibit B,' and referred to as a part of this petition, and on the 7th day of July, 1902, the Bank Commissioner of the territory of Oklahoma issued to said plaintiff a certificate of authority, as required by the laws of said territory, a copy of which is hereto attached, marked 'Exhibit C,' and referred to as a part of this petition.

"(4) The said plaintiff has continuously since the 23d day of May, 1902, in the town of Noble, county of Cleveland, Okla., been engaged in the business of banking, as authorized by law, and its authority by virtue of its articles of incorporation, patent, and certificate of authority; and since the 16th day of November, 1907, said plaintiff, in the same place, has been engaged in the banking business under and by virtue of the Constitution and laws of the state of Oklahoma.

"(5) On the 17th day of December, 1907, the Governor of the state of Oklahoma approved an act which had previously been passed by the Legislature of the state of Oklahoma, entitled 'An act creating a state Banking Board establishing a depositors' guaranty fund to insure depositors against loss when the bank be-

comes insolvent, prescribing the qualifications 'of officers and directors, fixing the salary of Bank Commissioner and his assistants and providing for more frequent examinations, fixing the penalty for embezzlement, limiting the amount of the banking funds that can be loaned to any one person, corporation or firm, declaring an emergency.' Laws 1907-08, p. 145, c. 6, art. 2. Section 1 of said act provides that, 'A state banking board is hereby created, to be composed of the Governor, the Lieutenant Governor, President of the State Board of Agriculture, State Treasurer and the State Auditor,' and the defendants C. N. Haskell, G. W. Bellamy, J. P. Connors, J. A. Menefee, and M. E. Trapp are, respectively the Governor, Lieutenant Governor, the President of the State Board of Agriculture, the State Treasurer, and the State Auditor, and the said named defendants by virtue of said act, constitute the State Banking Board of the state of Oklahoma, and the said defendant H. H. Smock is the Bank Commissioner of the state of Oklahoma.

"(6) By section 2 of said act it is provided that: 'Within sixty days after the passage and approval of this act, the State Banking Board shall levy against the capital stock an assessment of one per cent. of the bank's daily average deposits, less the deposits of the state funds, properly secured for the preceding year, upon each and every bank organized and existing under the laws of the state, for the purpose of creating a depositors' guaranty fund. Said assessment shall be collected upon call of the State Banking Board. In one year from the time the first assessment is levied, and annually thereafter, each bank subject to the provisions of this act shall report to the Bank Commissioner the amount of its average daily deposits for the preceding year, and if said deposits are in excess of the amount upon which the one per cent. was previously paid, said report shall be accompanied by additional funds to equal one per cent. of the said daily average excess of deposits, less the deposits of the national government for the year over the preceding year, and each amount shall be added to the depositors' guaranty fund. If the depositors' guaranty fund is depleted from any cause, it shall be the duty of the State Banking Board in order to keep said fund to one per cent. of the total deposits in all of the said banks subject to the provisions of this act, to levy a special assessment to cover such deficiency, which special assessment shall be levied upon the capital stock of the banks subject to this act, according to the amount of

their deposits as reported in the office of the Bank Commissioner. And said special assessment shall become immediately due and payable.' And the plaintiff states that said State Banking Board, acting under and pursuant to the pretended authority of said law, has levied an assessment against the capital stock of this plaintiff bank of one per cent. of its daily average deposits during the preceding year, which said average deposit amounts to $33,147. and that the said State Banking Board and the said Bank Commissioner, under and pursuant to said pretended law, proposes to compel this plaintiff to pay said one per cent. of its daily average deposits for the preceding year for the purpose of creating said depositors' guaranty fund for the benefit of the depositors of all the banks in said state upon which said law operates, and that the said defendants, unless restrained by this court, will force this plaintiff to pay said assessment, as provided by said pretended law, a copy of the said notice of assessment served on plaintiff is hereto attached, marked 'Exhibit D,' and referred to as a part of this petition.

"(7) Plaintiff further states that the said law under which the defendants are pretending to act is in conflict with and a violation of section 2 of article 2 of the Constitution of Oklahoma, which provides that 'all persons have the inherent right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry,' in that said law deprives this plaintiff of the enjoyment of the gains of its own industry, for the benefit of the depositors of other banks in which plaintiff has no interest.

"(8) Plaintiff further states that said pretended act is in conflict with and a violation of section 7 of article 2 of the Constitution of Oklahoma, which provides that 'no person shall be deprived of life, liberty, or property, without due process of law,' in that the said plaintiff is deprived of its property, by virtue of said assessment, without due process of law.

"(9) Plaintiff further states that said pretended law is in conflict with and a violation of section 15 of article 2 of the Constitution of Oklahoma, which provides that 'no bill of attainder, *ex post facto* law, nor any law impairing the obligation of contracts, shall ever be passed,' in that said law violates the contract between this plaintiff and the state of Oklahoma evidenced by its charter, patent and certificate of authority, copies of which are hereunto attached as Exhibits A, B, and C to this petition.

"(10)  Plaintiff further states that said pretended law is in conflict with and a violation of section 23 of article 2 of the Constitution of Oklahoma, which provides that 'no private property shall be taken or damaged for private use, with or without compensation, unless by the consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining or sanitary purposes, in such manner as may be prescribed by law,' in that the private property of this plaintiff is sought to be taken for private use, without compensation and against the consent of the plaintiff.

"(11)  Said pretended law is in conflict with and a violation of section 24 of article 2 of the Constitution of Oklahoma, which provides that 'private property shall not be taken or damaged for public use without just compensation,' in that said law proposes to take the property of this plaintiff; and, if it be held that said taking is a taking for public use, then said taking is without compensation, and not in accordance with the form prescribed for the taking of private property for public use, as set out more fully in said section 24.

"(12)  Said plaintiff states that said pretended law is in conflict with and in violation of section 57 of article 5 of the Constitution of Oklahoma, which provides that 'every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of the statutes, and no law shall be revived, amended or the provisions thereof extended or conferred, by reference to its title only, but so much thereof as is revived, amended, extended or conferred, shall be re-enacted and published at length, provided, that if any subject be embraced in any act contrary to the provisions of this section, such act shall be void only as to so much of the law as may not be expressed in the title thereof,' in that said law (1) creates a state banking board; (2) establishes a depositors' guaranty fund; (3) prescribes the qualifications of officers and directors; (4) fixes the salary of the Bank Commissioner; (5) fixes the penalty for embezzlement; (6) and limits the amount of the bank's funds that can be loaned to any one person; and expresses all of said six different purposes in the title, thus avoiding the entire act.

"(13)  Plaintiff further states that if said pretended law should be construed as levying a tax upon the property of plain-

tiff, it is in conflict with and a violation of section 8 of article 10 of the Constitution of Oklahoma, which provides that 'all property which may be taxed *ad valorem* shall be assessed for taxation at its fair cash value, estimated at the price it would bring at a fair voluntary sale,' in that said law, if it levies a tax, does not assess it upon the basis of the fair cash value of the property affected, but upon an arbitrary basis, having no regard to the fair cash value of the property assessed.

"(14) If said pretended law is construed as levying a tax, then it is in conflict with and a violation of section 9 of article 10 of the Constitution of Oklahoma, which provides that, 'except as herein otherwise provided the total taxes, on an *ad valorem* basis, for all purposes, state, county, township, city or town, and school district taxes, shall not exceed in any one year thirty-one and one-half mills on the dollar,' in that said law, for said special and private purpose, if it be construed as levying a tax, levies a tax on this plaintiff of about 3.31 per cent. of the fair cash value of the property of the plaintiff.

"(15) If said pretended law shall be construed as levying a tax, then it is in conflict with and a violation of section 14 of article 10 of the Constitution of Oklahoma, which provides that, 'taxes shall be levied and collected by general laws, and for public purposes only, except that taxes may be levied when necessary to carry into effect section thirty-one of the Bill of Rights,' in that said law, if it be construed as levying a tax, does not levy said tax for public use, but for private purposes.

"(16) Plaintiff further states that said pretended law is in conflict with and a violation of section 1 of article 14 of thte Constitution of Oklahoma, which provides that 'general laws shall be enacted by the Legislature providing for the creation of a banking department, to be under the control of a bank commissioner, who shall be appointed by the Governor for a term of four years, by and with the consent of the Senate, with sufficient power and authority to regulate and control all state banks, loan, trust and guaranty companies, under laws which shall provide for the protection of depositors and individual stockholders,' in that said pretended law does not provide for the protection of the individual stockholders of this plaintiff.

"(17) Plaintiff further states that said pretended law is in conflict with and a violation of section 10 of article 1 of the Constitution of the United States, which provides that 'no state

shall pass any bill of attainer, *ex post facto,* or law impairing the obligation of contracts, * * *' in that said law impairs the obligation of the contract between the plaintiff and the state of Oklahoma, as evidenced by its articles of incorporation, patent, and certificate of authority, copies of which are hereto attached as Exhibits A, B, and C.

"(18) Plaintiff further states that said pretended law is in conflict with and a violation of that portion of the fourteenth amendment to the Constitution of the United States which provides that 'no state shall make any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law, nor deny any person within its jurisdiction the equal protection of the laws,' in that said pretended act deprives this plaintiff of its property without due process of law, and denies to it the equal protection of the laws.

"(19) Wherefore plaintiff states that the said pretended act is null and void, because of its conflict with the Constitution of the state of Oklahoma and the Constitution of the United States, and that the said defendants, in acting under and enforcing the provisions of said pretended law, are wholly without right, and have no jurisdiction to make, levy, or enforce the aforesaid assessment of one per cent. upon the average deposits of the plaintiff.

"(20) Plaintiff further states that it is a solvent, growing concern, with its capital unimpaired, and perfectly able and willing to pay all its obligations to its depositors, and that it does not need and does not desire, the assistance of any other bank or of the state of Oklahoma.

"(21) Plaintiff further states that it has no adequate remedy at law to prevent the wrongs herein complained of, and that, unless the defendants are enjoined from enforcing the provisions of said law as against this plaintiff, it will be remediless. Wherefore plaintiff prays for a temporary injunction, restraining the said defendants, and each of them, from taking any further or other proceedings to levy against or collect the said assessment of one per cent or any other assessment, under said law against this plaintiff, and that on final hearing said temporary injunction may be made permanent, and plaintiff prays for such other, further, and general relief as to the wisdom of the court may seem proper."

In the court below, C. N. Haskell, as Governor of the state, demurred to plaintiff's petition on the following grounds: (1)

That the court had no jurisdiction of the person of the said defendant; (2) that the court had no jurisdiction of the subject of the action; (3) that the petition did not state facts sufficient to constitute a cause of action against said defendants. The other defendants, George W. Bellamy, as Lieutenant Governor, J. P. Connors, as chairman of the Board of Agriculture, J. A. Menefee. as State Treasurer, M. E. Trapp, as State Auditor, and H. H. Smock, as Bank Commissioner, interposed similar demurrers.

On the 19th day of February, A. D. 1908, each of the separate demurrers of the defendants to plaintiff's petition were sustained in the lower court as to the third ground therein set out. The plaintiff, duly saving its exceptions, elected to stand upon its petition, and refused to plead further, and judgment was rendered in favor of said defendants. Thereupon plaintiff was allowed ten days to prepare and serve a case-made, and defendants five days thereafter within which to suggest amendments thereto. Thereafter, on the 26th day of February, A. D. 1908, said case-made and the amendments thereto having been served in due time, and duly submitted for settlement and signing by the parties thereto, the same were duly certified to by the trial judge, and this cause is now properly before this court for review. Plaintiff is a banking corporation, chartered under the laws of the territory of Oklahoma on the 23d day of May, A. D. 1902, with a capital stock of $5,000, and afterwards, on the 6th day of September, A. D. 1902, its capital stock was increased to the sum of $10,000,

J. B. *Dudley* and *Flynn & Ames*, for plaintiff in error.
*Chas. West, Atty. Gen.*, for defendants in error.

WILLIAMS, C. J. (after stating the facts as above). Plaintiff in error contends that the carrying into effect of what is known as the "Depositors' Guaranty Law" will impair its charter contractual rights. Section 2 of the act of December 17, 1907 (Laws 1907-08, p. 146, c. 6, art. 2), establishing the depositors' guaranty fund, etc., provides as follows:

"Within sixty days after the passage and approval of this act.

the State Banking Board shall levy against the capital stock an assessment of one per cent. of the bank's daily average deposits, less the deposits of the state funds, properly secured for the preceding year, upon each and every bank organized and existing under the laws of the state, for the purpose of creating a depositors' guaranty fund. Said assessment shall be collected upon the call of the State Banking Board. In one year from the time the first assessment is levied, and annually thereafter, each bank subject to the provisions of this act shall report to the Bank Commissioner the amount of its daily average deposits for the preceding year, and if said deposits are in excess of the amount upon which one per cent. was previously paid, said report shall be accompanied by additional funds to equal one per cent. of the said daily average excess of deposits, less the deposits of the state funds properly secured, and less the deposits of the National government, for the year over the preceding year, and each amount shall be added to the depositors'. guaranty fund. If the depositors' guaranty fund is depleted from any cause, it shall be the duty of the State Banking Board in order to keep said fund to one per cent. of the total deposits in all of said banks subject to the provisions of this act, to levy a special assessment to cover such deficiency, which special assessment shall be levied upon the capital stock of the banks subject to this act, according to the amount of their deposits as reported in the office of the Bank Commissioner. And said special assessment shall become immediately due and payable."

The wisdom of the framers of the federal Constitution in providing that no state shall pass any law "impairing the obligation of contracts" cannot be overestimated. The state, as a worthy exemplar of the people residing therein, should deal with absolute honesty with every citizen. The progress and prosperity of civilized communities necessarily rests upon the sacredness of contracts. Confidence in contractual relations being a safeguard against fluctuation and chaotic conditions in business affairs, permanent advancement must depend upon the certainty of obligations. The faith of man in the business integrity of his fellowman, realized, is the fountain of development, trade, and commerce. The preservation of contracts lawfully entered into gives stability, not only to the present, but assurance for the future.

Strike down the safeguards against contracts, and society cannot advance. Unquestioned faith in their fulfillment elevates, not only communities, but individuals. But when an individual, or association of individuals, deals with the sovereign power in acquiring corporate privileges or franchises, and the sovereignty reserves the right to alter, amend, annul, revoke, or repeal such grant whenever in the opinion of the proper representative of such sovereignty such grant may be injurious to the citizenship thereof, it is obvious that, when such occasion arises, the Legislature should so act.

The question of the right of the Legislature to repeal a granting act was first before the Supreme Court of the United States in the year 1806, in the case of *Fletcher v. Peck*, 6 Cranch, 135 3 L. Ed. 162, where the Legislature of the state of Georgia had rescinded an act authorizing the sale of certain state lands to individuals, where it was charged that such act was procured through fraud. The land having passed into the hands of purchasers for valuable consideration, without notice, the court held that the state of Georgia was restrained, either by general principles which are common to free institutions, or by the particular provisions of the Constitution of the United States, from afterwards passing a law whereby the estate of the *bona fide* purchasers of the premises could be constitutionally and legally impaired and rendered null and void. The next case was that of the *Trustees of Dartmouth College v. Woodward,* 4 Wheat. 520, 4 L. Ed. 630, in the year 1819. Mr. Chief Justice Marshall, in an elaborate opinion, held that the charter granted by the British Crown to the trustees of Dartmouth College in New Hampshire, in the year 1769, was a contract "within the meaning of that clause of the Constitution of the United States (article 1, § 10) which declares that no state shall make any law impairing the obligation of contracts," and further held the act of the state Legislature of New Hampshire, altering the charter without the consent of the corporation, in a material respect, to be an act impairing the obligation of the charter and unconstitutional and void. The rule announced in this

case has been uniformly adhered to in that court. However, the Supreme Court of the United States has, without exception, held that whenever the Legislature granting a charter reserves the right to alter, amend, modify, or repeal it, either by so providing by general law, whether organic or statutory, or in the charter, the right to amend or repeal such charter exists, and to do so does not impair the obligation of a contract, the charter being obtained and accepted with the full understanding that the right to amend, modify, or repeal is a part of the contract and to the exercise of which right the grantee had consented.

Immediately after the Dartmouth College Case the importance of reserving the right to control corporate organizations, which. were from time to time being chartered, was realized and in many states general statutes, expressly reserving such powers, which statutes became a part of every act of incorporation as fully as if written therein, unless a different purpose was therein plainly expressed, were enacted. And afterwards, in most of the states as their Constitutions were revised, and in the new states as they were admitted into the Union, such provisions were incorporated in the organic law. On the 20th day of December, A. D. 1824, the Legislature of New Jersey incorporated the "New Jersey Protection & Lombard Bank," which corporation was organized to loan money upon real estate, public stock, or private property, to insure against loss or damage by fire or water, and to issue bills of credit, etc. It was expressly provided in said act that it should be lawful for the Legislature at any time to alter, amend, or repeal the same. This was one of the first acts, passed after the decision in the Dartmouth College Case, where such reservation was made. Afterwards, on the 23d day of November, 1825, the Legislature repealed the act of incorporation, and appointed trustees authorizing them to administer and wind up the affairs of said corporation, under the direction of the court of chancery. Afterwards, on the 10th day of December, 1825, the Legislature passed a supplementary act, with the preamble reciting that doubts had arisen touching the powers and duties of the trustees, and that it

was the intention of the repealing act to preserve, uninjured and unimpaired, all the then existing rights and responsibilities, whether in favor of or against said bank, and then enacting and declaring that the trustees were, and from the 'time of the passage of the repealing act should be deemed and taken to have been, vested as the trustees for the creditors of said bank and the stockholders existing at the time of the act of repeal, etc.

In the case of *McLaren v. Pennington,* 1 Paige (N. Y.) 109, the chancellor, in construing said charter and the repealing acts, said:

"The power of repealing the bank charter was therefore legally and constitutionally reserved to the Legislature of New Jersey, and this court will not presume that it has been improperly or unconscientiously exercised."

In the case of *De Camp v. Eveland,* 19 Barb. (N. Y.) 89, the court said:

"This legislative power is the very highest attribute of sovereignty, and its depositary the embodiment and concentration of the whole political force of the body politic, with such restraint only as the charter of government has imposed. It is the law-making power, and, as heretofore remarked, superior to either of the other departments of government. The Legislatures are nowhere restrained, directed, or limited in regard to the nature, grade, or character of evidence which they must have as the basis of their action, or to guide them in their decisions. In some specific cases their power is limited, and in others conditional, dependent upon the existence of certain facts. But they must necessarily decide whether such fact exists. Their general power to prescribe and regulate evidence for every other tribunal in the state has never been questioned, and it would present a singular anomaly if they were wanting in power to do the same for themselves, or to alter and change the same at pleasure; and it would be equally strange if any judicial tribunal in the state were permitted to review their decision upon the question of fact, on the existence of which their power to legislate in a particular case is made to depend. If such a thing were to be tolerated, it is not perceived why the existence of the fact in 'question may not, and in many cases must not, be proper to be submitted to a jury. It

is believed that but few would be bold enough to contend for a principle pregnant with such absurd results."

In the year 1838 the Legislature of New York passed what was known as the "General Banking Act" (Laws 1838, p. 245, c. 260), wherein it was provided that corporators or shareholders might stipulate in their charter that they should not be liable individually for the debts of the bank; but said act also contained a provision that the Legislature might at any time alter or repeal same. In 1846 a change was made in the Constitution of the state, which imposed individual liability on the stockholders of banks, and in 1849 a statute was passed providing for proceedings to enforce that responsibility. Laws 1849, p. 455, c. 313.

In the case of *Sherman v. Smith,* 1 Black. 590, 17 L. Ed. 163, Mr. Justice Nelson, speaking for the court said:

"One of the articles of association, as we have already seen, provided that the shareholders should not be liable in their individual capacities for any contract, debt, etc. The thirty-second section of the general banking act provided that 'the Legislature may at any time alter or repeal this act.' The argument on the part of the plaintiff is that this stipulation of the stockholders in the articles of association from exemption from all personal liability for the debts of the institution constitutes a contract, within the authority of the act under which it was organized, that cannot be legally impaired by the provision in the Constitution of New York, or by the act of 1849, which seeks to change the obligation and impose upon them personal liability; that, in respect to this bank, the provision in the Constitution and the law is void as against the Constitution of the United States. Now, in the first place, it is to be observed that the article of association relied on is but an affirmation of the principles contained in the twenty-third section of the act of 1838, and can be entitled to no greater effect or operation than the law itself, unless, indeed, by incorporating it into the articles it can be made permanent or perpetual. The section expressly exempts the individual liability of the stockholders, but confers the privilege upon the association to subject him to personal liability if they think fit. It was competent for the stockholders to avail themselves of this privilege in their articles of association, and thus, perhaps, increase public confidence in the credit of the institution. But we

can discover no authority in the section, or any necessity or propriety on the part of the association, for incorporating the law itself into their articles. Certainly in so doing they cannot change it, or make it more or less effectual. * * * Now, the thirty-second section, which reserved to the Legislature the power to alter or repeal the act by necessary construction, reserved the power to alter or repeal all or any of these terms and conditions, or rules or liability, prescribed in the act. The articles of association are dependent upon, and become a part of, the law under which the bank was organized, and subject to alteration or repeal the same as any other part of the general system."

See, also, *Attorney General v. North American Life Insurance Co.,* 82 N. Y. 187; *Lee's Bank of Buffalo,* 21 N. Y. 11; *Reciprocity Bank,* 22 N. Y. 9; *Plank Road Co. v. Thatcher,* 11 N. Y. 102; *Buffalo & New York City Railroad Co.,* 14 N. Y. 336; *Empire Bank,* 18 N. Y. 199.

In the year 1831 the Legislature of Maine passed an act containing the following provision:

"All acts of incorporation which shall be passed after the passage of this act, shall at all times hereafter be liable to be amended, altered or repealed, at the pleasure of the Legislature, in the same manner as if an express provision to that effect was therein contained, unless there shall have been inserted in such act of incorporation an express limitation or provision to the contrary." (Laws 1831, p. 352, c. 503.)

In the year 1877, in the case of *Railroad Co. v. Maine,* 96 U. S. 507, 24 L. Ed. 836, Mr. Justice Field, in construing this provision, said:

"By the reservation in the law of 1831, which is to be considered as if embodied in that act, the state retained the power to alter it in all particulars constituting the grant to the new company formed under it of corporate rights, privileges, and immunities."

In the year 1831 the Legislature of Massachusetts passed a measure to the effect that every act of incorporation which should thereafter be passed should at all times be subject to amendment, alteration, or repeal at the pleasure of the Legislature, provided that no act of incorporation should be repealed unless for vio-

lation of its charter, or other default, when such charter shall contain an express provision limiting the duration of the same.

In the case of *Crease v. Babcock et al.*, 23 Pick. (Mass.) 343, 34 Am. Dec. 61, Morton, Judge, speaking for the court, in construing this provision, said:

"Had the proviso to this section been omitted, this charter might have been amended, altered, or repealed, 'at the pleasure of the Legislature'; but the defendants' counsel argue that the proviso not only restricts the power to repeal, but entirely takes it away, because the inquiry whether the bank has violated its charter or committed any default is a judicial act, and therefore cannot constitutionally be performed by the Legislature. The effect of this argument is to raise the banks above the control of the Legislature, and place them, and all corporations with limited charters, upon a different basis from other corporations. All acts of incorporation are supposed to be granted with a view to the public welfare, as well as to promote private interest and individual enterprise, and therefore it is to be presumed that the Legislature, when charters are holden at their pleasure, will not repeal them capriciously, nor without due inquiry into all the facts and satisfactory evidence that they have ceased or failed to accomplish the objects for which they were established. In such case the exercise of the reserved power to repeal could not be vitiated or invalidated because the Legislature investigated the case to see whether it was reasonable to exercise the power before they actually repealed a charter. The true question is whether the Legislature can in any case repeal an act of incorporation granted for a term of years. Any charter may be forfeited by a violation or for other sufficient cause, and on proper process a judgment of forfeiture might be decreed. But this would be a judicial act, and might be done without the concurrence, and against the will, of the Legislature. It is entirely independent of and unconnected with the power to repeal. But the Legislature clearly intended to reserve the power to discontinue corporations, not only for violation of their charters, but also for other defaults, which must mean, if anything, some acts short of violations, but which were inconsistent with, if not subversive of, the ends for which the corporation was established. They reserve the power to repeal at pleasure provided that on certain charters they will not exercise it unless the corporations have committed some default. If a default has been com-

mitted, then, by the express terms of the compact, they have a right to exercise the power. They have exercised it and therefore. by the courtesy and confidence which is due from one department of the government to another, we are bound to presume that the contingency upon which the right to exercise it depended has happened. Nor is the objection that the Legislature had no power to inquire into the existence of the contingency valid. If any man or body of men is vested with power to do a certain act, upon the occurence of a certain event, when the event happens they have a right to perform the act, and the most that can be urged against it is that, if it be exercised before the event happens, it is void. And this is true by whomsoever the fact is to be ascertained. But we do not believe that the inquiry into the affairs or defaults of a corporation, with a view to continue or discontinue it, is a judicial act. No issue is formed. No decree or judgment is passed. No forfeiture is adjudged. No fine or punishment is imposed. But an inquiry is had in such form as is deemed most wise and expedient, with a view to ascertain the facts upon which to exert legislative power, or to learn whether a contingency has happened upon which the legislative action is required. This is the constant and necessary course of proceeding, not only in relation to private and special acts, but also to many public acts. In granting new charters or enlarging, modifying, or renewing old ones, and in a large portion of ordinary legislation, it is the duty of the Legislature to inquire and ascertain whether existing facts render their action expedient or necessary. These proceedings, though they bear some resemblance to. and have in view the same general object, the ascertainment of truth, yet in no proper sense can they be called. judicial acts. It is indispensable that this inquiry should, in the first instance, be made by the Legislature. No other body can do it for them. They have restricted themselves from exercising the power of repeal until a certain event happens. This they must necessarily ascertain before they can properly exercise the power. Their decision must, *prima facie,* be presumed to be right. Whether it be conclusive or not is a question which it is not necessary now to determine."

In the case of *Greenwood v. Freight Co.,* 105 U. S. 14, 26 L. Ed. 961, wherein this Massachusetts statute is construed, Mr. Justice Miller, speaking for the court, said:

"It was therefore in the power of the Massachusetts Legis-

lature to grant to another corporation, as it did, the authority to operate a street railroad through the same streets and over the same grounds previously occupied by the Marginal Company. Whether this action was oppressive or unjust in view of the public good, or whether the Legislature was governed by sufficient reason in thus repealing the charter of one company, and in chartering another at the same time to perform as part of its functions the duties required of the first, is not, as we have seen, a judicial question in this case. It may well be supposed, if answer were required to the complainant's bill, that it was made to appear that the Marginal Company had shown its incapacity to fulfill the objects for which it was created, and that another corporation, embracing larger area, connecting with more freight depots and wharves, and with more capital, could better serve the public in the matter for which both franchises were given."

In the year 1841 the General Assembly of South Carolina enacted the following:

"It shall become part of the charter of every corporation which shall, at the present, or any succeeding session of the General Assembly, receive a grant of a charter, or any renewal, amendment, or modification thereof (unless the act granting the charter, renewal, amendment, or modification shall, in express terms, except it), that every charter, of incorporation granted, renewed, or modified as aforesaid, shall at all times remain subject to amendment, alteration, or repeal by the legislative authority." (11 St. at Large, p. 108, § 41.)

In the case of *Hoge v. Railroad Co.*, 99 U. S. 353, 25 L. Ed. 304, Mr. Justice Field, speaking for the court, said:

"By the law of 1841 every charter of a corporation in South Carolina subsequently granted, amended, or modified was subject to repeal, amendment, or modification by the Legislature, unless specially excepted from such legislative control in the act granting the charter, amendment, or modification. Such is evidently the meaning of the forty-first section of that law, though the intention is inaptly expressed. This construction is somewhat different from that placed upon it in *Tomlinson v. Jessup*, reported in 15 Wall. 454, 21 L. Ed. 204, and gives the Legislature a more extended control. But it is the construction to which a more careful examination of the language has led us. By it the Legislature said that subsequent charters should be subject to repeal or

amendment, unless they are in express terms excepted from its control in the acts granting them, and that existing charters, if subsequently amended or modified, should stand in the same position. Its conditions constituted the condition upon which every charter was afterwards granted, amended, or modified. They formed as much a part of the new or amended charter as if they had been originally embraced in it. They did not, of course operate as a limitation upon the power of the succeeding Legislatures so as to control any repugnant legislation, but so long as they remained unrepealed, subsequent legislation, not repugnant in its terms, was to be construed and enforced in accordance with them."

The Legislature of Kentucky, in the year 1846, provided that:

"All charters and grants of power to corporations or amendments thereto thereafter enacted or granted, and all other statutes, should be subject to amendment or repeal at the will of the Legislature, unless a contrary intent be therein plainly expressed: Provided, that whilst the privileges and franchises so granted are subject to amendment or repeal, no amendment or repeal shall impair other rights previously vested."

In the case of *Louisville Water Co. v. Clark,* 143 U. S. 1, 12 Sup. Ct. 346, 349, 36 L. Ed. 55, Mr. Justice Harlan, speaking for the court, said:

"In short, the immunity from taxation granted by the act of 1882 was accompanied with the condition—expressed in the act of 1856 and made a part of every subsequent statute when not otherwise expressly declared—that, by amendment or repeal of the former act, such immunity could be withdrawn. Any other interpretation of the act of 1856 would render it inoperative for the purpose for which, manifestly it was enacted."

Article 4, § 31, of the Constitution of California, 1849, provides as follows:

"Corporations may be formed under general laws, but shall not be created by special act. All laws now in force in this state concerning corporations, and all laws which may hereafter be passed pursuant to this section, may be altered from time to time, or repealed."

In the case of *Spring Valley Waterworks Co. v. Schottler,* 110

U. S. 348, 4 Sup. Ct. 51, 28 L. Ed. 176, Mr. Justice Waite, delivering the opinion of the court, said:

"But it is argued that, as the laws in force before 1858 for the formation of water companies, which provided for fixing the rates by the municipal authorities, were not accepted by the Spring Valley Company, and that of 1858, without such a provision, was, it is to be inferred that the state contracted with this company not to subject it to the judgment of such authorities in a manner so vital to its interests. If the question was one of construction only, this argument might have force, but the dispute now is as to legislative power, not legislative action. The Constitution of California, adopted in 1849, prohibiting one Legislature from bargaining away the power of succeeding Legislatures to control the administration of the affairs of a private corporation formed under the laws of the state. Of this legislative disability the Spring Valley Company had notice when it accepted the privileges of the act of 1858, and it must be presumed to have built its works and expended its moneys in the hope that neither a succeeding Legislature, nor the people in their collective capacity when framing a Constitution, would ever deem it expedient to return to the old mode of fixing rates, rather than on any want of power to do so, if found desirable. The question here is not between the buyer and the seller as to prices, but between the state and one of its corporations as to what corporate privileges have been granted. The power to amend corporate charters is, no doubt, one that bad men may abuse, but when the amendments are within the scope of the power, the courts cannot interfere with the discretion of the Legislatures that have been vested with authority to make them."

Section 1636 of the Code of the state of Georgia (1861), which came into force on the first day of January, 1863, provided:

"In all acts of private charters hereafter granted the state reserves the right to withdraw the franchise, unless such right is expressly negatived in the charter."

In the case of *Railroad Co. v. Georgia,* 98 U. S. 365, 25 L. Ed. 185, Mr. Justice Strong, speaking for the court, said:

"No such right was negatived in the charter granted to the plaintiff in error. Consequently the franchise was held subject to a power in the state to withdraw it and subject to be changed,

modified, or destroyed at the will of its grantor or creator. These provisions of the Code became, in substance, a part of the charter."

Article 1, § 2, of the Constitution of Ohio, 1851, provides: "No special privileges or immunities shall ever be granted that may not be altered, revoked or repealed by the General Assembly:"

In the case of *Hamilton Gas Light Co. v. Hamilton City,* 146 U. S. 270, 13 Sup. Ct. 93, 36 L. Ed. 963, Mr. Justice Harlan, speaking for the court, said:

"If the statute under which the plaintiff became incorporated be construed as giving it the exclusive privilege, so long as it met the requirements of law, of supplying gas light to the city of Hamilton and its inhabitants by means of pipes laid in the public ways, there is no escape from the conclusion that such a grant, as respects, at least, its exclusive character, was subject to the power of the Legislature, reserved by the state Constitution, of altering or revoking it. This reservation of power to alter or revoke a grant of special privileges necessarily became a part of the charter of every corporation formed under the general statute providing for the formation of corporations. A legislative grant to a corporation of special privileges, if not forbidden by the Constitution, may be a contract; but, where one of the conditions of the grant is that the Legislature may alter or revoke it, a law altering or revoking, or which has the effect to alter or revoke, the exclusive character of such privilege, cannot be regarded as one impairing the obligation of the contract, whatever may be the motive of the Legislature, or however harshly such legislation may operate, in the particular case, upon the corporation affected by it. The corporation, by accepting the grant subject to the legislative power so reserved by the Constitution, must be held to have assented to such reservation."

The Constitution of the state of Pennsylvania (article 1. § 26), adopted in 1857, provided as follows:

"'The Legislature shall have power to alter, revoke, or annul any charter of incorporation hereafter conferred by or under any special or general law, whenever, in their opinion, it may be injurious to the citizens of the commonwealth; in such manner, however, that no injustice shall be done to the corporators."

In the *Pennsylvania College Cases,* 13 Wall. 213, 20 L. Ed. 550, Mr. Justice Clifford, delivering the opinion of the court, said:

"Cases often arise where the Legislature, in granting an act of incorporation for a private purpose, either make the duration of the charter conditional, or reserve to the state the power to alter, modify, or repeal the same at pleasure. When such a provision is incorporated in the charter it is clear that it qualifies the grant, and that the subsequent exercise of that reserved power cannot be regarded as an act within the prohibition of the Constitution. Such a power also—that is, the power to alter, modify, or repeal an act of incorporation—is frequently reserved to the state by a general law applicable to all acts of incorporation, or to certain classes of the same, as the case may be, in which case it is equally clear that the power may be exercised whenever it appears that the act of incorporation is one which falls within the reservation, and that the charter was granted subsequent to the passage of the general law even though the charter contained no such condition, nor any allusion to such a reservation. Reservations in such a charter, it is admitted, may be made, and it is also conceded that, where they exist the exercise of the power reserved by a subsequent Legislature does not impair the obligation of the contract created by the original act of incorporation. Subsequent legislation, altering or modifying the provisions of such a charter, where there is no such reservation, is certainly unauthorized if it is prejudicial to the rights of the corporators and was passed without their consent, but the converse of the proposition is also true that, if the new provisions altering and modifying the charter were passed with the assent of the corporation, and they were duly accepted by the corporate vote as amendments to the original charter, they cannot be regarded as impairing the obligation of the contract created by the original charter. Private charters, or such as are granted for the private benefit of the corporators, are held to be contracts, because they are based for their consideration on the liabilities and duties which the corporators assume by accepting the terms therein specified; and the grant of the franchise, on that account, can no more be resumed by the Legislature, or its benefits diminished or impaired without the assent of the corporators, than any other grant of property or legal estate, unless the right to do so is reserved in the act of incorporation, or in some general law of the state which was in operation at the time the charter was granted."

In the case of *Matthews v. Board of Corporation Commissioners* (C. C.) 97 Fed. 404, Simonton, Circuit Judge, said:

"If, then, it be admitted that this right to regulate rate charges was a part of the charter of this company, and is as if it were repeated in *ipsissimis verbis,* it was subject to the control of the General Assembly, and could be altered or repealed at its pleasure. This being so, the act creating the corporation commission, and giving it the right to regulate the rates of railroads, is an alteration of, and a repeal *pro tanto* of, this charter. *Railroad Co. v. Pendleton,* 156 U. S. 667, 15 Sup. Ct. 413, 39 L. Ed. 574; *Hoge v. Railroad Co.,* 99 U. S. 348, 25 L. Ed. 303; *Railroad Co. v. Gibbes,* 142 U. S. 390, 12 Sup. Ct. 255, 35 L. Ed. 1051; *New York & N. E. R. Co. v. Town of Bristol,* 151 U. S. 556, 14 Sup. Ct. 437, 38 L. Ed. 269. This action upon the part of the state does not impair the obligation of a contract."

Under the territorial government of Iowa a charter was granted to the Miners' Bank, the twenty-third section of which provided as follows: "That if said corporation shall fail to go into operation, or shall abuse or misuse their privileges under this charter, it shall be in the power of the legislative assembly of the territory to annul, vacate, and make void this charter." Prior to the admission of the state into the Union the territorial Legislature repealed the act chartering said bank. In the case of *Miners' Bank of Dubuque v. United States,* 1 Iowa, 561 (1 G. Greene), a case which was pending in the territorial Supreme Court, transferred to the State Supreme Court on the admission of the state into the Union, Mr. Chief Justice Hastings, speaking for the court, said:

"It is to be presumed that the original grantees believed that no legislative assembly would ever exercise the power of repeal until the contingencies contemplated had happened. Such was the confidence reposed in the good faith which the legislative assembly is presumed always to exercise towards the rights of the citizens, and it is to be regretted that the plaintiffs in error should have had their confidence so shaken as to feel themselves authorized to spread upon the records of the courts, facts, if true, which would involve the members of the Legislature in the deepest turpitude and corruption. The plaintiffs propose to prove that, when the act of repeal was passed, the bank had never misused or abused its privileges, and did not fail to go into operation. However

legitimate it might have been for plaintiffs in error to prove such facts before the Legislature and its committee, they are now forever estopped by a solemn decision in both branches of the legislative assembly. If we award ·to the act of repeal the weight and power of a judgment of a court of record, or even of a justice of the peace, it will be readily admitted that it is not in the power of this or any other tribunal to collaterally question the validity of the act. * * * However oppressive it may appear for a party to a contract to reserve the right of rescinding the same at pleasure, or upon the occurrence of events, of the existence of which he is to be the judge, yet that a party ·has a right to make such a reservation will not be questioned. The members of the Legislature are the agents of the public, and are presumed to have no personal interests to serve other than what pertains to their constituents in common with themselves. They act in a fiduciary capacity, and are not amendable to the odium attached to a party who reserves the right of being a judge in his own case."

The Constitution of the state of Deleware of 1832, article 2, § 17, reserved to the Legislature the power to revoke charters. In the case of *Deleware Railroad Co. v. Tharp*, 5 Harr. 456, the court said:

"It never could have been the purpose of the convention to reserve to the Legislature a mere power to revoke charters from whim or caprice, and without any cause. Such an idea would be fatal to all public improvement, through the action of corporations. No one would invest his money in a bank or railroad or canal if his rights were constantly subject to be taken away without cause, and it would be contrary to the first principles of justice, after men, under the sanction of legislative charter, have invested their money in public improvements, to have their corporate powers withdrawn without cause. True this provision of the Constitution reserves to the Legislature alone the right to judge whether the corporation has abused its powers, and thus to revoke charters, but the reasonable construction of the Constitution is that this shall be done upon examination and trial before the Legislature, upon grounds stated."

See, also, the Constitution of the state of Maryland, 1851, article 3, § 47, which provides as follows:

"That corporations may be formed under general laws, but shall not be created by special acts, except for municipal purposes,

and in cases where in the judgment of the Legislature the object of the corporation cannot be obtained under general laws. All laws and special acts in pursuance to this section may be altered from time to time, or repealed."

In the case of *State v. Northern Central Railway Co.*, 44 Md. 160, Judge Robinson, in delivering the opinion of the court, said:

"The object of this provision of the Constitution of 1850 was to preserve to the state control over its contracts with corporations, and to prevent the grant of corporate powers beyond the interference of the Legislature, should the public interest at any time require such interference. It constituted, therefore, a condition upon which every charter was granted and held, and qualified to that extent the contract between the state and the corporators. The appellee having derived its right under the act of 1854, when the Constitution of 1850 was in force, and the exemption from taxation claimed being a part of such charter, the power of the Legislature to repeal or revoke the immunity thus granted is, we think, too clear to be questioned. The fact that no such right was reserved in the act of 1854, incorporating the appellee, can make no difference. The Constitution is the supreme and controlling law, and under its provisions the right to alter, amend, or repeal every charter granted by the Legislature to a private corporation is reserved as fully as if such reservation had been made in the charter itself."

When the plaintiff in error was chartered as a banking corporation section 3, c. 18 (section 932) Wilson's Rev. & Ann. St. 1903, providing as follows: "Every grant of corporate power is subject to alteration, suspension or repeal, in the discretion of the Legislature"—was in force and effect, and, except as amended or repugnant to our Constitution, is still in force in this state. Section 1, Schedule (Bunn's Ed. § 450) Oklahoma Constitution. Section 47, art. 9 (Bunn's Ed. § 262) Oklahoma Constitution, provides as follows:

"The Legislature shall have power to alter, amend, annul, revoke or repeal any charter of incorporation or franchise now existing and subject to be altered, amended, annulled, revoked, or repealed at the time of the adoption of this Constitution, or that

may hereafter be created, whenever in its opinion it may be injurious to the citizens of this state, in such manner, however, that no injustice shall be done to the incorporators."

The Legislature are the sole and exclusive judges to determine whenever the exercise of the rights under such charter is injurious to the citizens of the state. It is to be amended or repealed in such manner, however, that no injustice shall be done the incorporators! This is not a limitation upon the power of the Legislature to alter, amend, annul, revoke, or repeal such charter, but a direction that such power shall be exercised in such manner as not to work an injustice upon the stockholders. When the plaintiff corporation was chartered, the corporators assenting to the terms thereof, the charter was acquired with the full understanding that the Legislature in its discretion could alter, suspend, or repeal the same. There is no allegation in plaintiff's complaint that prior to or since the ratification of our Constitution there has been any change in the personnel or holdings of the shareholders, and when the corporators agreed that the Legislature might alter, suspend, or repeal said charter at pleasure, how can they be heard to complain now that the Legislature has seen fit, in the exercise of its discretion, to amend said charter? Or that it was done in such a manner as to do them an injustice? Under the provisions of section 47, art. 9, of the Constitution, *supra*, the Legislature, whenever in its opinion a charter is injurious to the citizens of the state, should exercise its power to alter, amend, annul, revoke, or repeal the same; but it is directed therein to provide for the winding up or administering of the affairs of such corporation so as to protect, not only the creditors, but also the corporators.

Section 1 of chapter 4 of the Session Laws of 1899, p, 79, as amended February 12, 1908 (Laws 1907-08, p. 153, c. 6, art. 3), provides as follows:

"Any three or more persons, a majority of whom shall be residents of this state, may organize themselves into a banking association, and be incorporated as a bank * * * ; and pro-

vided further, that all banking institutions now organized as corporations, doing business in this state, are hereby permitted to continue said business as at present incorporated, but in all other respects, their business, and the manner of conducting the same, and the operation of said bank, shall be carried on subject to the laws of this state, and in accordance therewith.   *   *   * "

Counsel for plaintiff in error in their brief state: "It is doubtless true that such a law could be enforced as to banks chartered after its passage, because then it would be optional with the persons desiring to organize a bank to incorporate or not, as they liked.   If they chose to avail themselves of the law, they could not then object to it, but as to banks already in existence, that have no choice in the matter, the law does not operate upon them by their consent, but purports to compel them to act under its provisions."   Counsel overlook the fact that the law merely provides that "all banking institutions now organized as corporations, doing business in this state are hereby permitted to continue as at present incorporated, but in all other respects, their business, and the manner of conducting the same, and the operation of said bank, shall be carried on subject to the laws of this state, and in accordance therewith."   The Legislature was authorized to unconditionally repeal such charter, and to make provision for the winding up of its affairs.   It is not compulsory upon the stockholders to continue in the banking business.   If they do not see proper to comply with the laws of the state, and to conduct the business of the bank in accordance therewith, it has the option to wind up its affairs, pay its depositors, settle with its creditors and stockholders, and discontinue business.

In 1862 the Legislature of New York incorporated the North American Life Insurance Company, which continued business until March 8, 1877.   For several years before the last date it had issued registered policies and annuity bonds under the acts, chapter 576, p. 1237, of the Laws of 1866, chapter 708, p. 1782, of the Laws of 1867, and chapter 902, p. 2273, of the Laws of 1869. There being registered and nonregistered policy holders, the claim

was made, in the case of the *Attorney General v. North American Life Insurance Company,* 82 N. Y. 182, that the three acts heretofore referred to, so far as they provided for a special fund for the security of the registered policy holders, were unconstitutional, and therefore all of the funds of the company should be combined into one fund, in which all the creditors of the company should share *pro rata.* Mr. Justice Earl, in delivering the opinion of the court in that case, said:

"It is also contended that the acts were in conflict with section 9 of article 7 of the Constitution, which provides that 'the credit or the state shall not in any manner be given or loaned to, or in aid of, any individual, association, or corporation.' The answer to this contention is that the credit of the state was not given or loaned by these acts. It simply became the custodian of the securities deposited with it. It incurred or assumed no responsibility, except as a depositary. Its responsibility was just like that assumed by the state under the Safety Fund Act (1 Rev. St. [2d Ed.] p. 606, pt. 1, c. 18, tit. 4), and under the General Banking Law of 1838 (chapter 260, p. 245), and under the General Insurance Law of 1853 (chapter 463, p. 887), which requires a deposit with the comptroller of securities to the amount of $100,000. It was never before supposed that the constitutional provision cited was intended to prohibit the assumption by the state of the responsibility imposed by such acts. It is further contended that the act of 1869 violates both the state and federal Constitutions, in that its provisions deprive life insurance companies of their property without due process of law. This is plainly not so. Section 7 of that act provides that, if at any time the affairs of any life insurance company which has deposited securities under the act shall, in the opinion of the superintendent of the insurance department, appear in such a condition as to render the issuing of additional policies and annuity bonds by such company injurious to the public interest, the superintendent shall report such fact to the Attorney General, whose duty it shall then be to apply to the Supreme Court for an order requiring the company to show cause why its business should not be closed. The court must, thereupon, proceed to hear the allegations and proof of the respective parties; and, in case it shall appear to the satisfaction of the court that the assets and funds of the company are not sufficient to justify the further continuance of the business of in-

suring lives, granting annuities and incurring new obligations, as authorized by its charter, then the court must issue an order enjoining and restraining the company from further prosecution of its business, and appoint a receiver of all the assets and credits of the company. The Legislature had the right to alter or repeal any law under which these companies were organized, and thus prescribe the conditions upon which their existence could be continued or terminated. It could terminate the existence of every insurance company in this state, without violating any constitutional provision."

Plaintiff in error, with its charter powers granted subject to alteration, suspension, or repeal in the discretion of the Legislature, without any qualifications—and there is no allegation that there has been any change in the holding of shares since the adoption of the Constitution—insists that the clause "in such manner, however, that no injustice shall be done to the incorporators" is a limitation upon the exercise of the power of the Legislature to alter, suspend, or repeal its charter, and cites the case of ·*Vicksburg v. Waterworks Co.,* 202 U. S. 464, 26 Sup. Ct. 660, 663, 50 L. Ed. 1102, wherein Mr. Justice Day, speaking for the court, said:

.    "Furthermore, the Mississippi Constitution contains this provision, which is not in the Ohio Constitution considered in the Hamilton Case, namely: 'Provided [in exercising the right of amendment or repeal of a charter] no injustice shall be done to the stockholders.' "

The words placed in brackets by the court are interpolative construction of that proviso. The clause in the Oklahoma Constitution is "that it shall be done in such a manner." The office of the proviso is that of limitation, and in the Mississippi Constitution evidently the fair construction is that the Legislature should have power to alter, amend, or repeal any charter of incorporation then existing and revocable, and any thereafter granted, when in its opinion it may be to the public interest to do so, when such alteration, amendment, or repeal shall do no injustice to the stockholders. The provision of the Oklahoma Constitution does not limit the power, but regulates or directs the manner. The framers

of the Oklahoma Constitution, regarding public interests, lodged the power absolutely in the Legislature to alter, amend, annul, revoke, or repeal such charters. But at the same time, regardful of private rights, directed that the Legislature should take such precautions, in the manner of exercising that right, as to work no injustice upon the corporators. Section 10, art. 16, of the Pennsylvania Constitution is practically identical with the provision of the Oklahoma Constitution, and in construing that section in the Pennsylvania College Cases, *supra,* the Supreme Court of that state makes no intimation that the words therein used, "in such manner, however, that no injustice shall be done to the corporators," are a limitation upon the power of the Legislature to exercise its discretion in determining whether or not it will alter, revoke, annul, amend, or repeal any charter of incorporation. The court in that case said: "Reservations in such a charter, it is admitted, may be made, and it is also conceded that where they exist the exercise of the power reserved by a subsequent Legislature does not impair the obligation of a contract created by the original act of incorporation."

The business of banking, by reason of its intimate relation to the fiscal affairs of the people, is, and ever has been, considered a proper subject of legislative control, and strictly within the domain of the internal police power of the state. Such business is as essential and necessary to the conduct and carrying on of trade and commerce as are common carriers. Mr. Freund on Police Power, in section 450, says:

"When we examine the nature of the restrictions on the business of banking and insurance we find that nearly all aim to the same object: The protection of depositors and insured from losses resulting from insolvency of the bank or insurance company. This loss is to be averted by insisting upon some guaranty or financial stability. Provisions of this kind are not absolutely confined to banking and insurance. In some states railroad or other public service corporations may not issue securities without complying with prescribed conditions, or without the consent of designated authorities, and the power of corporations to borrow money may

be generally limited. But in the case of banking and insurance they are not necessarily confined to corporations, and by far exceed the financial regulations imposed upon any other kind of business. While all the provisions furnish protection against fraud, they do not intend to be limited to guarding against that danger, but plainly seek to prevent more improvidence or inadequacy of resources. The justification of this must be found in the peculiar nature of the business regulated. Both banks and insurance companies deal in their own credit, while they receive cash; and, in addition, banks and life insurance companies are the depositaries of a large proportion of the savings of the people, so that the management of each institution affects a considerable part of the public. These conditions create a special public danger, requiring a more incisive exercise of the police power than is called for in any ordinary business."

He further says in section 401:

"Banking and insurance being peculiarly affected with a public interest, it follows that the right to carry on either business may be made to depend upon the compliance with certain conditions; and a license may be required as evidence of compliance. In New York, in the case of savings banks and trust companies, the authorization is only given upon ascertaining that the general fitness of the organizers for the discharge of the duties appertaining to the trust is such as to command the confidence of the community, and that the public convenience and advantage will be promoted by such establishment."

In the case of *Myers et al v. Manhattan Bank,* 20 Ohio, 295, Mr. Justice Ranney, speaking for the Supreme Court of that state, said "that the creation of a corporation is an exercise of sovereign legislative power," and on page 303 of 20 Ohio he further states:

"Now it will be not doubted that it was competent for the Legislature to have allowed all persons to bank, or to have prohibited all, or to do as they have done, allow all 'incorporated by a law of this state,' and prohibit all others. The policy of this legislation is perfectly obvious. They intended to guard the community against fraud and imposition, by exacting of persons engaging in this business the proper security before they were suffered to enter upon it, and to make them directly amenable for abuses to our own laws."

The following authorities support the rule that the matter of regulating and prohibiting private banking, and all banking not expressly authorized by law, is within the discretion of the Legislature, under that branch of the police power relating to public safety, and that the courts will not interfere and declare such legislation unconstitutional, as an invasion of public rights: *People v. Bartow,* 6 Cow. (N. Y.) 290; *People v. Utica Insurance Co.,* 15 Johns. (N. Y.) 358, 8 Am. Dec. 243; *People v. Brewster,* 4 Wend. (N. Y.) 498; *Pennington v. Townsend,* 7 Wend. (N. Y.) 276; *Hallet v. Harrower,* 33 Barb. (N. Y.) 537; *Nance v. Hemphill,* 1 Ala. 551; *Austin v. State,* 10 Mo. 591; *State ex rel. Goodsell v. Woodmansee,* 1 N. D. 246, 46 N. W. 970, 11 L. R. A. 420; *Curtis v. Leavitt,* 15 N. Y. 9; *State v. Williams,* 8 Tex. 255; *Bristol v. Barker,* 14 Johns. (N. Y.) 205; *Louisville S. V. & T. Co. v. Louisville & N. R. Co.* (Ky.) 17 S. W. 567, 14 L. R. A. 579; *Thorpe v. Railroad Co.,* 27 Vt. 140, 62 Am. Dec. 625; *Baker v. State,* 54 Wis. 368, 12 N. W. 12; *Myers et al. v. Manhattan Bank,* 20 Ohio, 295; Cooley's Const. Lim. (7th Ed.) pp. 555, 556; Morse on Banking (3rd Ed ) § 13; Zane on Banks & Banking, §§ 7-15. The only authority to the contrary is the case of *State v. Scougal,* 3 S. D. 55, 51 N. W. 858, 15 L. R. A. 478, 44 Am. St. Rep. 756.

And that cannot be considered as a case in point, as the decision is based upon section 18, art. 6, of the Constitution of the state of South Dakota, which provides:

"No law shall be passed granting to any citizen, class of citizens, or corporation, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations."

The provision in our Constitution, section 51, art. 5 (Bunn's Ed. § 124), reads as follows: "The Legislature shall pass no law granting to any association, corporation, or individual any exclusive rights, privileges, or immunities within this state." Ours is, in effect, that every association or corporation, and any individual, may have any right that any other of the same class may have; while the South Dakota section prohibited the granting to a corporation what was not extended to an individual. We have

searched with care, and this is the only case we have been able to find that has ever questioned the right of the Legislature in exercising police power to regulate, restrain, and govern the business of banking. It was for this purpose that the act relating to banks and banking was passed by the Legislature of Oklahoma on the 10th day of March, A. D. 1899 (Sess. Laws, Okla. 1899, p 79, c. 4). Section 17 provides: "It shall be unlawful for any individual, firm or corporation to transact a banking business, or to receive deposits, except by this act authorized. Any person violating the provisions of this act. * * *" This is substantially the same as the section construed by the Supreme Court of North Dakota, in the case of *State ex rel. Goodsill v. Woodmansee,* 1 N. D. 246, 46 N. W. 970, 11 L. R. A. 420, which provided as follows:

"It shall be unlawful for any individual, firm or corporation to continue to transact a banking business, or to receive deposits for a period longer than six months, immediately after the passage and approval of this act, without first having complied with and organized under the provisions of this act."

The act of the Oklahoma Legislature of March 10, 1899, providing for the organization, management, control, regulation, and supervision of banks, and providing penalties for the violation of the provisions thereof, is a very comprehensive one. Section 11 places double liability upon the stockholders; section 12, restrictions upon the business, in that it forbids the employment of the bank's funds in trade, by buying wares, etc., and investing in the stock of other banks, or making loans on its stock as security; section 13, which is practically the same as section 15 of the act of December 17, 1907, requires a reserve fund; section 14, likewise practically the same as section 16 of the act of December 17, 1907, places a limit on the liability that any person, company, corporation, or firm may incur to any bank; section 18 requires reports. The act of December 17, 1907, supplements the act of March 10, 1899, as amended by the Legislature in the years 1903 and 1905. Section 12 thereof prescribes certain qualifications of

directors.    Section 13 forbids any active managing officer from borrowing money from the bank under pains and penalties; section 18 lodges with the Bank Commissioner the authority and power to regulate and control banks, for the protection of· the stockholders and depositors, and authorizes him to remove from office any dishonest, reckless, or incompetent officer or employe, Section 1 creates a state banking board, composed of the Governor, Lieutenant Governor, President of the State Board of Agriculture, State Treasurer, and State Auditor.    Section 2 provides for the creation of the depositors' guaranty fund.

On February 12, 1908, section 1 of chapter 4 of the Session Laws of 1899 was amended so that the last proviso therein reads as follows:

"And provided further, that no bank, except those that have complied with, or that may be organized under the laws of this state relating to trust companies, shall engage in any business other than is authorized by this act."    (Laws 1907-08, p. 154, c. 6, art. 3, § 1.)

The Legislature of Oklahoma, in the exercise of its power, had the right to create corporations with reservations, and to make banking a franchise.    And the state, through its Constitution, permits the same power in its Legislature, and continues such grants of corporate power as were made by the Oklahoma Legislature. with the reservations therein.

The Legislature of the state of Vermont, in the year 1831, passed a general banking law (Laws 1831, p. 16, No. 20), by which a safety fund was created.    It was provided that all banks chartered or rechartered at that or any future session of the Legislature should be subject to the provisions of that act.    By section 2 it was provided that each bank should pay to the Treasurer of the state three-fourths of 1 per cent. on the capital stock paid in annually, on the 3d Tuesday of October.    By section 4 that this, should continue until each bank should have paid in 4½ per cent. on its capital stock, which should remain inviolably appropriated to the payment of the debts, exclusive of the capital stock, of any

of the said banks which should become insolvent. By section 8 that, if the funds should be reduced by the payment of the debts of any insolvent bank, every bank then existing which should be subject to that act, and every one thereafter chartered, should be assessed again by the Treasurer, not exceeding the original rate, until the funds should be restored to 4½ per cent. on the capital stock of said banks. Section 11 provides that if the funds in the treasurer's hands should be insufficient to pay the debts of any insolvent banks, the several solvent banks should be assessed according to section 8, until the fund should be sufficient to pay them, and then they should be paid. These provisions were construed in the year 1851 in the case of *Elwood et al. v. Treasurer of Vermont,* 23 Vt. 701 (8 Ann. Ed. 234) without the constitutionality of the act being questioned. Afterwards, in the year 1866, provisions relating to this safety fund were passed on by the Supreme Court of the state of Vermont in the case of *Receiver of Danby Bank v. State Treasurer,* 39 Vt. 92 (12 Ann. Ed. 32), without the constitutionality of the act being questioned. So it evidently was assumed by all parties that the same was valid.

In the year 1829 (Laws 1829, p. 167, c. 94) the Legislature of New York passed a safety fund law. By that act the banks were required to pay into a safety fund to be held by the Comptroller and Treasurer, a tax on the capital stock, at the rate of one-half per cent. per annum until the amount paid in was equal to the amount of three per cent. of their capital stock. They were allowed to issue notes to double the amount of their capital, whilst their loans could not exceed two and one-half times their capital. Finances and Currency Bill, p. 130, House Report, 5629, 49th Congress; *People v. Walker,* 17 N. Y. 502; *Reciprocity Bank,* 22 N. Y. 9; Id., 29 Barb. (N. Y.) 371. The appellate courts in New York construed the provisions of said act without the question of their constitutionality ever being raised.

It is worthy of note, with reference to the banks chartered under the acts of the Legislature of Vermont in the year 1831, *supra,* and the safety fund acts of the Legislature of New York

in the year 1829, *supra*, that in said respective states prior thereto there were neither any organic or general legislative provisions by which the power was reserved to repeal, modify, or. amend charters, granted either under general or special laws; such general legislative provision having been adopted in Vermont in 1851 (No. 45, p. 40, §1), and in New York in 1830 (Lee's Bank of Buffalo, 21 N. Y. 16, and incorporated in the New York Constitution of 1846, art. 8 § 7). It is further to be noted that for the administration of such laws there were no such rigid safeguards in the way of the requirements of reserve fund stipulations as to what the capital stock could not be invested in, such prescribed qualifications of directors, imposition of double liability upon the stockholders, and absolute restrictions and prohibition on the active officers from borrowing money from the bank without incurring pains and penalties, and the further provisions for frequent inspection and the removal of incompetent officers.

The miser who hoards is not only looked on with disfavor in the pages of Holy Writ, but also in all the chronicles of civilized man. Development and progress are made, not with the talent buried, but with it in use. In the exercise of the police power for the protection of public interest and for the public welfare it is the duty of the government to provide every protection and safeguard against loss to depositors that money, the circulating medium may not be hoarded, but kept in circulation in order that there may be progress and prosperity and happiness. Section 1, art. 14 (Bunn's Ed. § 315) Okla. Const. provides:

"General laws shall be enacted by the Legislature providing for the creation of a banking department, to be under the control of a bank commissioner, * * * with sufficient power and authority to regulate and control all state banks, loan, trust and guaranty companies, under laws which shall provide for the protection of depositors and individual stockholders."

The Legislature having amended and supplemented the banking laws of the territory of Oklahoma, which were extended to and remained in force in the state by the provisions of the Schedule to

the Constitution, after its admission into the Union, in accordance with the requirements of section 1, art. 14, *supra,* the legislative judgment, in providing for the protection of depositors and individual stockholders, should not be disturbed by the courts, and such law declared invalid, unless its repugnancy to the Constitution appears beyond a reasonable doubt. *Fletcher v. Peck,* 6 Cranch, 128, 3 L. Ed. 162; *Higgins v. Brown,* 20 Okla. 355, 94 Pac. 703; *City of Pond Creek et al v. C. N. Haskell et al.,* 21 Okla. 711, 97 Pac. 338.

In the case of *State v. Richcreek,* 167 Ind. 217, 77 N. E. 1085, 5 L. R. A. (N. S.) 874, 119 Am. St. Rep. 491, the court said:

"It is charged that the provisions of Acts 1905, p. 182, c. 109, § 2, forbidding more than one-third of the capital of the bank to be invested in real estate, bank furniture, and fixtures for the conduct of the business of the bank, and the second and fifth subdivisions of section 3 of the statute are invalid and unconstitutional. The right of banking in all of its departments at common law belonged to the individual citizen, to be exercised at pleasure. It is conceded by counsel, and it is unquestionably settled, that the sovereign authority of the state may regulate and restrain the exercise of such right. * * * The quasi public nature of the banking business, and the intimate relation which it bears to the fiscal affairs of the people and the revenues of the state, clearly bring it within the domain of the internal police power, and make it a subject for legislative control. Bankers invite general deposits primarily for their own profit, and usually obtain a measure of public patronage, and the expediency of guarding the people against imposition, extortion, and fraud, of affording means of detecting irregular practices, and of learning the true financial condition of the bank, and the necessity of preserving the confidence of patrons in its solvency, and of protecting their interest in the case of insolvency, justify inspection and control by the state. When the sovereign people of the state, acting through the Legislature, find such police regulation necessary to protect public health, safety, or morals, to prevent fraud or oppression, or to promote general welfare, the power to act is supreme, subject only to such limitations as are imposed by the fundamental law. The question as to what regulations are proper

and needful is primarily for legislative decision, yet, when the police power is used to regulate a business or occupation which in itself is lawful and useful to the community, the courts, if called upon, must determine finally whether such regulations as may have been prescribed are so far just and reasonable as to be in harmony with constitutional guaranties. (*Republic Iron & Steel Co. v. State,* 160 Ind. 379, 385, 66 N. E. 1005, 62 L. R. A. 136.)

"Appellee's learned counsel frankly concede that the business of banking, whether conducted by a corporation or by individuals, is a legitimate subject of inspection and regulation by law under the police power, and, further, that the provision of section 2 of the act under consideration, making it unlawful to transact a banking business under this act on a capital of less than $10,000 in money, bank furniture, fixtures, and real estate, all to be set apart and kept good for the security of creditors of the bank, are wise and salutary. They earnestly contend, however, that the proviso 'that the real estate, bank furniture and fixtures shall not constitute more than one-third in amount and value of the entire capital of such bank' contravenes the constitutional guaranty that 'no man's property shall be taken by law without just compensation' (Ind. Const. art. 1, § 21), since many private bankers already in business have bank furniture and fixtures and real estate of more than half, and in some cases nearly equal to, the value of the whole banking capital. It is further argued that this clause violates section 23 of the first article of the state Constitution, which provides 'that the General Assembly shall not grant to any citizen or class of citizens privileges and immunities which, upon the same terms, shall not equally belong to all citizens', inasmuch as it casts a burden of discriminating inequality upon established bankers having valuable banking houses and equipments; and finally, that it deprives such bankers of their property without due process of law, and abridges their privileges and immunities in contravention of the fourteenth amendment of the Constitution of the United States.

"It was held in *Aurora v. West,* 9 Ind. 74, 83, that it is only the taking of specific pieces of private property by the exercise of the power of eminent domain, without compensation, that is prohibited by section 21, art. 1, of the state Constitution, and that might properly be taken by taxation for public purposes without any other compensation than the general and common benefits accruing from the expenditure of the fund thereby produced. It

is equally clear that this constitutional provision was not intended to serve as a restraint upon the exercise of the police power of the state for the public welfare, by which a particular use of property, once lawful and unobjectionable, may be forbidden, or property be wholly destroyed, without compensation and without the consent of the owner. The insistence that the act grants special privileges and immunities is equally untenable. It is manifest that in every regulating statute the precise terms prescribed must be to some extent arbitrary, depending upon the exercise of a sound legislative judgment. The constitutional mandate is satisfied if there be no manifest intent to discriminate in favor of a particular class of citizens to the exclusion of others similarly circumstanced, and the provisions of the restrictive act be in fact open alike to all citizens who may bring themselves within its terms. This act neither confers special privileges, nor makes unjust discriminations, but its privileges are open to every citizen upon the same terms. It denies no privilege to any one and operates alike upon all who may avail themselves of its benefits. * * * The circumstances that for a time may inflict hardship, inconvenience, and possibly loss to certain individuals, does not amount to a constitutional objection so long as such burdens or losses are not needlessly and unreasonaly imposed, but result as an incident to a general enactment fairly designed to subserve the public welfare. If the mere fact of resulting inconvenience and loss to an established business, admittedly subject to public control, were sufficient to preclude control under the police power, then regulation would be practically impossible, and this most salutary and necessary power of sovereignty be seriously abridged or wholly destroyed. This statute grants equal privileges, and imposes like restrictions upon all persons under the same circumstances, and does not deprive appellee of due process of law, or deny him equal protection of the law, in violation of the fourteenth amendment of the Constitution of the United States. * * * The same constitutional objections are urged against the validity of section 3 of the act, which requires the banker to make oath 'that the responsibility and net worth of the individual members of such firm, partnership, or individual is equal to an amount at least double the amount of capital paid into such bank.' It is insisted that this clause prohibits a banker from using all of his capital in his business, and is an instance of arbitrary selection and of illegal discrimination. It is not correct to say that the banker is thereby prohibited from

using all of his capital in his business. But he is forbidden from treating his entire holdings as capital stock, and in effect required to have and maintain a reserve or surplus fund. In considering this proposition it must be borne in mind that the banking business is not wholly private, but quasi public, in character and subject to governmental supervision, and in view of this fact, the arguments advanced appear more appropriate for legislative than for judicial consideration. This feature of the statute is not different in principle from the double liability of stockholders in incorporated banks, and, for the reasons already given, and upon the authorities cited, we are of the opinion that it does not violate any of the constitutional principles relied upon by appellee."

Section 27 of article 12 of the Constitution of Missouri, provides:

"It shall be a crime, the nature and punishment of which shall be prescribed by law, for any president, director, manager, cashier, or other officer of any banking institution to assent to the reception of deposits, or the creation of debts by such banking institution after he shall have had knowledge of the fact that it is insolvent or in failing circumstances; and any such officer, agent, or manager shall be individually responsible for such deposits so received, and all such debts so created with his consent."

Said Constitution went into effect November 30, 1875. The Central Savings Bank was created by a special charter in 1857, without any reservation as to amendment or repeal of the same. On March 2, 1876, the plaintiff, in the case of *Cummings v. Spaunhorst,* 5 Mo. App. 23, deposited with, and loaned to, said bank a certain sum of money, the bank soon thereafter failing. Suit was brought against the defendant therein as a stockholder, on the ground that he was individually responsible under said section 27 of article 12 of the Constitution, *supra.* The court said:

· "It is next claimed that the directors who are here sued accepted their positions and held them under a special charter, and cannot be affected by a subsequent act which increases their liability. It is claimed that this liability would impair the obligation of the contract between the bank and the state, but in what way the defendants in error do not show. A certain act is forbidden, and a penalty is imposed upon certain persons who violate the pro-

hibition; and, instead of providing that the penalty shall go to the state, or that an informer may sue for and recover it, this clause incidentally affords a remedy to the injured party, as the old statutes often did to the party aggrieved. This has nothing to do with the franchise of the corporation, but it would not matter if the incorporation were incidentally affected. This corporation is subject, as are its officers, to the police power of the state, and the provisions of its charter cannot exempt it from regulations made in the exercise of that power. *Thorpe v. Railroad Co.,* 27 Vt. 140, 62 Am. Dec. 625; *Peters v. Railroad Co.,* 23 Mo. 107; Cooley's Const. Lim. (3d Ed.) 573. Nor need the regulations be now more distinctly made, in the exercise of the police power, than as indicating an intent to carry out a policy which the state deems essential for the protection of rights in property; and regulations so made do not, because they incidentally affect it, impair the obligation of a contract. *The State v. Matthews,* 44 Mo. 523; *Price v. Insurance Co.,* 3 Mo. App. 262."

Banks are chartered by the state, not with the paramount view of enabling the stockholders to make investments and derive profits therefrom, but to meet a public necessity. The stockholders, having made investments therein, should be protected, but private interest must always be subordinated by the state, in the reasonable exercise of its police power, to the public welfare or good. With the view that the depositor, as well as the stockholder, and the general public with an incidental interest therein, may be protected, banking is regulated, and limitations, restraints, and requirements are imposed. The imposition of double liability upon the stockholders; the requirement of reserve funds; stipulations as to what capital stock cannot be invested in; prescribed qualifications of the directors—all these having been tried, in the judgment of the Legislature the further restriction that active officers should not borrow from the bank without incurring pains and penalties was deemed salutary. In addition to further and more completely protect the depositors, the depositors' guaranty fund is created, the Legislature acting pursuant to the mandatory declaration of the Constitution (section 1, art. 14).

Because the sovereignty, in the exercise of its police powers,

grants or permits franchises to banking corporations, at the same time providing for the protection of all deposits placed therein by creating a depositors' guaranty fund, banking corporations being compelled to pay in a certain stipulated and *pro rated* amount for the benefit of the depositors and for the public welfare, it does not follow that such payments are made by such banks without reciprocal compensation or benefit. What are banks organized for? Are the officers and stockholders acting from a spirit of philanthropy in securing a charter and establishing such business? Or is it done for the purpose of gain? it being at the same time both necessary and convenient for persons engaged in business to deposit their money in the banks, and have the benefit of exchange, the banking corporation receiving, under certain limitations and regulations, the benefit of the use of the deposits, ofttimes without any compensation whatever to the depositor in the way of interest. In most instances the deposits subject to check bear no interest, and when the same are placed for a designated time, it is usually at a low rate, much lower than that at which the bank loans. True the bank performs a valuable and a necessary service in every community, being a clearing house for the business concerns, and through its channels are furnished the ways and means for the financing of enterprises for the development of the country, the moving of crops, and the carrying on of all necessary business. The honest, reasonable, just, law-respecting banker bears a very necessary and commendable relation to the community, town or city in which he is located.

When contracts are made, certain confidence is assured in business transactions. When deposits are made, safe confidence in banks is assured. Then whatever protects the depositor protects the bank, because it assures confidence in the bank. And with the bank restricted in its operations by a rigid requirement of the law: Careful inspection; frequent reports; ample reserve fund to be retained; limitation on the amount that may be loaned; no loan to be made to an active officer therein without criminal punishment being incurred; restrictions as to what the funds of the

bank may be invested in—all of these limitations and safeguards thrown around the banking world should justify banks in having confidence in one another.   Each bank having a reciprocal interest in the depositors' guaranty fund, thereby each has an incidental reciprocal interest in every other bank.   The banker can no more properly be permitted to say in regard to other banks, "Am I my brother's keeper?" than could the man in Holy Writ in the days of old, in the sight of Jehovah, repeat with approval such a subterfuge, for under this law each banker is his brother banker's keeper; he having an individual interest in the result of the management of each bank.

The national, state, county, municipal, and district governments, as a rule require security for deposits.   Why may not the same power be exercised to require the guaranty of the deposits of individuals?   The national, state, county, municipal, and district governments prescribe how their deposits shall be secured.   Why should not the government, in the exercise of the same power, prescribe how the banks shall guarantee or secure the deposits of the citizens of the state?   With the law enforced, the reckless, dishonest, and incompetent banker cannot remain in business.   The law closes the door of hope against him.   For the *pro rata* amount each bank is required to deposit with the banking board to constitute the guaranty fund, every one gets a reciprocal benefit therefrom.   For every dollar that a bank is required to pay into such fund it receives a reciprocal protection and benefit, not only for itself, but also for its depositors; for what secures the depositor is certainly a benefit to the bank.   It may not be so apparent in times of universal prosperity and contentment; but in the eras of depression and discontent the bank that has the assured confidence of its depositors should certainly be regarded as benefited, for there is no danger of any general and unnecessary withdrawal of deposits from such bank.   The bank that can rest assured against such contingencies thereby receives a benefit.   Consequently the guaranteeing of deposits occasions, not only assurance to the depositor, but relief to the bank from any apprehension of any un-

necessary run upon and withdrawals from the bank. Whilst such assessment for the guaranty fund goes to the protection of every other bank, as well as its own, yet every bank receives a reciprocal benefit for its *pro rata* assessment paid into such fund, and thereby there is an equal reciprocal benefit to every bank in the state. The presumption is that the Bank Commissioner will efficiently administer the laws of his department, and with that law enforced there can be no banks whose assets will not pay their liabilities. The brand of insolvency will be placed upon none, except as a result of defalcation or acts of Providence, occasioned by the seasons, the rains, and drouths, and pestilences. And there should be enough of the milk of human kindness in the soul of every man, whether he be banker, money lender, farmer or laborer, that he should take pleasure in participating in the reimbursement of losses occasioned by such misfortune. Mutual insurance companies, both life and fire, are based upon this business and humane proposition, and upon the eternal principles of right as written, not only in the sacred pages by the divine hand, but at one time or another impressed upon the heart of every human being.

Counsel for plaintiff in error neither makes any contention or any attempt to show that the annual profits of this bank will not exceed any reasonable estimated assessment to be made by the banking board for said depositors' guaranty fund, nor that such assessment or assessments will prevent the bank from earning a reasonable annual dividend, but cite authorities to support their contention that this assessment amounts to a confiscation. Said authorities relate to charges prescribed for a service to be performed by such as public service corporations, stockyards, and the like, said charges having been fixed by commissions or by the Legislature, and the question involved in such cases was whether or not the fixed charges amounted to a confiscation, on the contention that the service could not be performed except at a loss, and without any return upon the investment. Here the state has imposed conditions under which new banks could be organized and engage in the banking business, and also under which old banks could

continue such business. One of the conditions is that they provide, in a designated way, for the guaranteeing of the deposits of the people that place money in such banks; the state at the same time having adopted rigid safeguards to preserve, not only the capital stock, but the deposits in each bank, with a view of protecting the individual stockholders of every bank in the state. Where can this be any confiscation of any rights acquired under any bank charter; there being no contention made that the reasonable estimated assessments will be so large as to prevent the bank annually from earning a sufficient amount to pay this assessment, and also a reasonable dividend?

, It is further asserted that national banks can neither guarantee the debts of other persons or corporations nor become accommodation indorsers, and for that reason the section permitting national banks to avail themselves of the privileges of the protection of this depositors' guaranty fund law permits an injustice against the state banks, as the national banks which might avoid themselves of the benefit of the law could, if they desire, repudiate the contract as *ultra vires,* and refuse to continue to pay their assessments, thereby endangering the assessment fund paid *pro rata* by the state banks, in the event of the failure of national banks which have availed themselves of the privileges of said law. Concede that such a contract is *ultra vires* as to national banks, that does not render the law invalid as to state banks. If the contract of the banking board is not binding upon the national banks, the converse of the proposition is also true, that it is not binding upon the State Banking Board. Neither party could claim any independent benefit under a void law or statute. At most, all the national bank could recover, in such event, would be the money paid under the same in good faith, when not against public policy.

In section 12 of plaintiff's complaint it is alleged that the depositors' guaranty act is in conflict with section 57, art. 5 (Bunn's Ed. § 130), Okla. Const., which provides that "every act of the Legislature shall embrace but one subject, which shall be clearly expressed in its title. * * *" This question is neither

preserved in this court by any assignment of error, nor is the same urged in any way in the brief of plaintiff in error, and under our rules the same is waived. At any event it seems to be without merit. *Lindsay v. United States Savings & Loan Association,* 120 Ala. 156, 24 South. 171, 42 L. R. A. 783.

Another question arising is whether or not the petition of plaintiff in error states facts sufficient to entitle it to the equitable relief prayed for. That portion of the petition upon which they rely to entitle them to relief by injunction is as follows: "And the plaintiff states that the said State Banking Board, acting under and pursuant to the pretended authority of said law, has levied an assessment against the capital stock of this plaintiff bank of one per cent. of its daily average deposits during the preceding year, which said average deposits amount to $33,147, and that the said State Banking Board and the said commissioner under and pursuant to said pretended law, proposes to compel this plaintiff to pay said one per cent. of its daily average deposits for the preceding year for the purposes of creating said depositors' guaranty fund for the benefit of the depositors of all of the banks in said state upon which said law operates, and that the said defendants, unless restrained by this court, will force this plaintiff to pay said assessment, as provided by said pretended law, a copy of the said notice of assessment served on plaintiff is hereto attached, marked 'Exhibit D' and referred to as a part of this petition." It is nowhere alleged therein how the defendants in error intend to compel the plaintiff in error to pay said assessment. There is no attempt made to plead the facts and circumstances to show how plaintiff in error will be compelled to pay said assessment and that in attempting to compel the payment thereof the plaintiff in error will sustain irreparable injury.

"The plaintiff should set forth, in a brief but clear manner, all the facts and circumstances out of which the principles of equity arise upon which he asks relief. It is a well-settled rule of pleading that bare allegations of conclusions cannot avail the pleader, especially where demurrer is interposed, without a state-

ment of the probative facts upon which his conclusions are based; and even when the facts are alleged, the averment of the pleader's conclusions may often be stricken out upon motion as irrelevant and redundant. Because of the harshness of the remedy by injunction, strict adherence to this rule of pleading is required in a suit for an injunction." (10 Enc. Plead. & Prac. p. 925, and authorities cited in footnote 1.)

"It is insufficient to allege merely that the plaintiff will suffer injury, however grievous or intolerable such injury may be, without averring that the injury apprehended is irreparable." (10 Enc. Plead. & Prac. p. 951, and authorities cited in footnote 1.)

We conclude that the act complained of is neither repugnant to the Constitution of Oklahoma nor that of the federal government. And, further, that the allegations in plaintiff's petition did not state facts sufficient to justify equitable interference, and the issuance of the writ of injunction prayed for was properly denied.

The judgment of the lower court is affirmed.

All the Justices concur.